### DE LASKI & THROPP CIRCULAR WOVEN TIRE CO. et al. v. UNITED STATES TIRE CO.

(District Court, S. D. New York. December 8, 1915.)

1. PATENTS ⊂⊃328—ANTICIPATION—APPARATUS FOR MAKING WHEEL TIRES.

The Thropp patent, No. 822,561, for an apparatus for making wheel tires, *held* void for anticipation by prior use.

2. PATENTS ⊂⊃73—DATE OF INVENTION.

To carry back the date of invention of a patented combination to the time of a prior disclosure by the patentee, all of the elements of the combination as patented must have been present in the structure then disclosed.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 64; Dec. Dig. ⊂⊃73.]

3. PATENTS ⊂⊃16—"INVENTION."

"Invention" necessarily involves a conscious element. It is the imaginative projection as an integral idea of certain selected natural objects. The fortuitous juxtaposition of the elements, without any conscious recognition of some pragmatic relation, is sterile and valueless.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 14, 15; Dec. Dig. ⊂⊃16.

For other definitions, see Words and Phrases, First and Second Series, Invention.]

In Equity. Suit by the De Laski & Thropp Circular Woven Tire Company and others against the United States Tire Company for infringement of letters patent No. 822,561, for apparatus for making wheel tires, granted to Peter D. Thropp. On final hearing. Decree for defendant.

Walter C. Noyes and E. Clarkson Seward, both of New York City, for plaintiffs.

Livingston Gifford and Ernest Hopkinson, both of New York City, for defendant.

LEARNED HAND, District Judge. This case is an effort to secure a different result from the decision of the Circuit Court of Appeals for the First Circuit by means of new testimony. It divides itself into two parts: The first, testimony leading to the conclusion that the "Goodrich use," upon which the defendants relied in that case, was in fact only an experiment, or at least was not shown to be more than an experiment; the second, testimony to carry back the date of the invention from February 1, 1905, to January, 1904. I shall consider these two efforts in the order stated.

[1] I shall start with the use of the molds to make the four 36 by 4½ inch tires which were delivered to the Baker Motor Vehicle Company on January 10, 1905. The plaintiff raises only one question regarding the deliveries of the molds before January 6, 1905, and this is that the weight of castings delivered and paid for is 854 pounds, which it says was about right for a closed mold, but nearly twice as much as enough for an open mold. I assume that somewhere in the case there is evidence that the weight in question is too great for the open molds, though I have not been referred to such testimony. Still under that assumption I think the discrepancy is immaterial. There cannot be the least doubt that open molds were delivered on January 6, 1905, and paid for on January 7th. The Goodrich Company may have paid too much, but that is beside the point.

The next question is of the manufacture of the tires. The mold books show plainly that the open molds were to be used with ring 967, which had also its complement of closed molds. Thus you might make a closed mold tire or an open mold tire on that ring. Order 1,181 is for four tires, which are to be made on ring 967 and to be "cured in open heat." Now the drawings for the open heat mold are expressly called "open heat molds" and "open heat fillets." Yet it is urged that the tires may have been produced without any molds at all, but by mere wrapping of them around the ring. If so, the beads were formed beforehand, and the order was for two-cure process and the open cure was the second part of it, during which the tire could merely be wrapped around the ring or core. Yet we find that the composition numbers for these tires are "685, 838," and that there is but one period of cure indicated; i. e., 1 hour and 20 minutes. Let us turn to the other orders: Wherever there was a double cure, two entries appear in the heating directions, calling for 3 hours, instead of 1 hour and 20 minutes, and divided into two periods, of which one is always called "open" and the other is not. Moreover, the composition is always "379, 379." This appears in orders 1,184, 1,961, 1,960, 1,834, 1,881, 1,962, 2,115, and 2,025. On the other hand, where the cure is single, the composition is always "685, 838," and there is but one period—i. e., 1 hour and 20 minutes—except in one order, where it is 1 hour and 10 minutes.

These are orders 1;182, 1,184, 1,188, 1,297, 1,307, 1,388, 1,636, and 1,308. Order 1,184 was first made out for a single short cure of 1 hour and 20 minutes, with composition 685, 838; but the first two tires of the form ordered were later changed to another mold and a 3-hour cure, and the composition 379, 379, was substituted. On this order the first intention was to cure all the tires in open heat, but this was later abandoned.

The necessary inference from these orders is that the cure in order 1,181 was single. If single, not even the plaintiff, I believe, would contend that it could have been accomplished without molds 1,008 and 1,009, or that merely wrapping it around the ring would do. This being premised, the words "cure in open heat" can mean only one thing, which is as the defendant insists. The supposed change of that entry amounts to nothing whatever, as inspection will satisfy. Now, it is true that the order does not contain the mold numbers; but that was inevitable. The order was made on December 23, 1904, before the molds had been made, though not before they were designed. They could hardly have got a mold number before they came to the factory on January 6, 1905.

The delivery of the tires need not rest upon Duffy's testimony; the best evidence is the actual payment for them upon the invoice describing them. I must confess I can hardly imagine a more complete documentary demonstration of the making and delivering of these four tires than this evidence discloses, under the necessary limitation of factory conditions.

The plaintiff answers that the sale was experimental; at least, that it might be. Everything points to the contrary. On January 20, 1905, the company paid $250 for additional complete sets of 4, 3½ or 2½ inch molds, which had all been designed in the preceding December. Why should it have thus prepared four sets to experiment with, when one was enough? The fact that no orders appear for 4-inch and 3½-inch tires does not indicate that they were experimental, but only that they were not called for commercially, a very different matter. The inference certainly is strong that the Goodrich Company was prepared to make such tires generally. Further, while we have not the drawings, we do have it upon the entry in Alkire's book that there was an equipment of open heat molds for the ring of mold 942 to make a set of 30 by 3 inch tires. I see no reason to question the entry or suspect its good faith, especially in the light of orders which I shall now consider.

All but one of the other factory orders are for 30 by 3 inch tires, and the mold for these was No. 942. All evidence is missing of the manufacture of open molds for 942, except Alkire's entry that it had an open mold equipment. Nevertheless, the orders show, first, that such molds were intended; and, second, that they were used. First, consider the order 1,307, which was never filled. It was for a single cure tire, as is proved by the time of curing and the composition to be used, and it was intended to be an open cure tire, for it says so. Consider next order 1,184 in its original form. It likewise directed the manufacture of two 2½-inch tires by a single cure in open heat, but was

afterwards changed; it also directed the manufacture of two 3-inch tires by a single cure in open heat, and the significant phrase is used, "Baker ring No. 942; see below." Why does it repeat the mold number, when the number 942 has been once already used? The words "see below" have reasonable reference to "cure in open heat," an instruction which would explain why, after the closed molds number was used, the words "Baker ring" should be added, a meaningless addendum, if the tire was to be made on a closed mold. These orders are consistent only with intended open molds for 942, but they do not show that these ever were used.

Let us now take up the other orders for 942. Order 1,188 is for a single cure tire on "Baker ring No. 942" cured in open heat, and it was filled; orders 1,297 and 1,308 are the same, though the words "Baker ring No. 942" are omitted; order 1.388 would be the same if the mold No. 942 had not been erased. Some mold must, of course, have been used, and the only known mold for 30 by 3 inch tires was 942. Now these orders amount in all to twelve other tires, and demonstrate in my judgment that Alkire was right when he said there was an open mold equipment for ring 942. It is true that in the case of the two cure 30 by 3 tires we have no proof from the order that the first or second cure was with an open mold, but we do know that there must have been such molds, if once we assume that they were necessary for a single cure tire by open heat.

We have proof, then, that the company had actually made and delivered four 4½-inch tires, that they had outfits for 4-inch, 3½-inch, 3-inch, and 2½-inch tires, that they actually made 3-inch tires on these open molds, and that they made many others on what might have been open molds. We have further the evidence of witnesses, in some instances, apparently unbiased, e. g., Mell, who says that the instances thus proved concretely in mechanical detail, and fixed absolutely in date, were not sporadic, but part of a series of commercial orders which the company was regularly filling. Admitting that memory may be unreliable as to details of manufacture and dates, it is not so as to whether a given instance was single or became part of a series. The exact details, and dates we have; the extent and provisionality of the instances is a matter which men will remember. I must confess that to extend an arid pedantry to this kind of proof does not seem to me in the interest of justice. Men's lives and liberty depend upon no such meticulous casuistry as is so often invoked to save a patent, and I can see no supreme public interest in subjecting an art to the monopoly of a supposed first inventor, by the exercise of perverse and arbitrary ingenuity to put askew all reasonable proof that others have come into the field before him.

Therefore, I agree with the Circuit Court of Appeals for the First Circuit that the patent was anticipated in January, 1905. The next question is of carrying back. I accept the plaintiffs' proof in toto that Thropp made the molds which he claims in January, 1904, and used them to hold together provisionally the bead of a tire which he was making out of a new single piece fabric, which he had found intractable under ordinary management. The heating necessary to this purpose

did not, however, semicure or cure in any way any part of the tire which the mold did not touch. Of course, a patentee is entitled to his monopoly upon all undiscovered uses of his invention, and, if Thropp completed his invention at that time, it is immaterial whether he only had in mind dealing with a difficult fabric or something else.

[3] Yet invention necessarily involves a conscious element. It is the imaginative projection as an integral ideal of certain selected natural objects. The fortuitous juxtaposition of the elements without any conscious recognition of some pragmatic relation is sterile and valueless. It was essential that Thropp should have grasped as a combination the elements which he later embodied in his patent. Once he did so, and incorporated them into physical form, he had completed his invention; but no combination will serve of less than all the elements consciously understood as related to each other. The question of what was the combination of the patent, therefore, depends upon what series of elements he selected as a structural unity, and this is unquestionably to be determined in part by the purposes for which he made it. That the unity once conceived is in no sense dependent upon the inventor's specific creative purpose is in no sense inconsistent with the necessity of some originating purpose to the satisfaction of which all the elements combine. The measure of combination may therefore be taken as the least which will answer what could have accomplished the inventor's declared purpose. · ·

Now it is perfectly clear that in the case at bar he was concerned with an apparatus which would make a clencher tire, or, as he says, one which would hold it in position while it was vulcanized. It is quite as clear that he presupposed that the whole surface of the tire was to be contained in some manner under pressure, for he says, when speaking of the fillets, *17* and *18* (lines 65–70), "the whole is wound with a wrapping of tape *19*, the filling-pieces *17*, *18*, serving to impart the pressure of the winding tape to the sides of the tire to hold the latter in position during the vulcanizing process." Moreover, no one would think of making a tire while leaving that part of it without any support whatever. It is not necessary to consider whether some kind of tire might be made or what difficulties are inherent in the use of any such structure. If it is apparent from all the evidence that no one would in fact make a commercial tire leaving the space in question vacant, it must follow that the fillets or their equivalent were in fact a part of the actual combination disclosed. It may be that a longitudinal wrapping or straight-jacket would be the equivalent of the fillets, just as the tapering edges of the infringement are; but some equivalent is essential within the meaning of the patent. Unless some such limitation is read into claims 1 and *2*, they go beyond the disclosure and claim an impractical device; in short, they are not tire-forming apparatus, because they will not form a tire which would be commercially accepted. If, therefore, these claims are to be confined to the disclosure, as they must be, they do not include the molds devised by Thropp in 1904.

Furthermore, if the invention is found in Thropp's press of January, 1904, it is antedated by the Fisk cold press of 1903 and 1904.

It can make no difference that the press was intended only as a cold press, for it is the apparatus which was patented. The sole question here is what elements are included in the apparatus. This press was amply proved to antedate January, 1904. The evidence of the first date of this device is as follows: The Fisk Company experienced difficulty in making the beads of a kind of tire known as the "Bolted-On" type. Their first expedient was to cut away that part of the closed mold which covered the tread, making an open mold like Thropp's 1904 mold, but with the sides rising higher. The date when this mold, of which one of the originals was produced in evidence, Exhibit 205, was made, is not proved by any document, though Cole says categorically that it was used in 1903, and Jameson is sure that they began to use it within 60 days after he came to the company in the early summer of 1903. Having found these molds useful for the preliminary treatment of the tires, a drawing and pattern were made for a similar mold of which an example was produced, Exhibit 206, whose sides stopped nearer the bead. This was, except for the form of the bead, precisely similar to Thropp's 1904 mold. It is quite true that the only drawing in evidence is dated June 10, 1904, but Cole is certain that a mold was in use in 1903. Moreover, he produced certain bills from the Lamb Company, the casters, showing the delivery of molds like Exhibit 206, of which the earliest was December 23, 1903. On that day were received castings from 2½-inch, 3-inch, and 3¼-inch patterns in this shape. The drawing in evidence, dated June 10, 1904, was for a 4-inch mold. The castings of that mold were delivered June 24, 1904. There is, therefore, no discrepancy in the evidence, though the drawings for the 2½-inch, 3-inch, and 3¼-inch molds, delivered on December 23, 1903, are certainly missing. I can see no reason, however, to question the credibility of Cole's identification of these castings delivered on December 23, 1903, as being in fact made like Exhibit 206, nor to doubt the date.

Having fixed the date of the earliest castings delivered like Exhibit 206, there is the strongest possible reason to suppose that the molds made in the Fisk factory by changing over the old molds antedated them. These were confessedly makeshifts, and were originally made for experimental purposes. They must in reason have preceded the order for castings made after patterns, and the substitution of Exhibit 206 reasonably marks the final termination of the experimental character of the effort. Hence we have, in my judgment, the best of reasons for supposing that Cole, Jameson, and Bennett are right in saying that Exhibit 205 was used in 1903, and that during that year they were replaced by molds designed to become a part of the standard equipment of the factory. Hence I have no hesitation in finding that the Fisk mold antedates Thropp's 1904 model. I do not, of course, mean that the Fisk mold was itself an anticipation of the patent; but, if Thropp may carry back to January, 1904, then he is met by an apparatus as near to his invention as that by which he would carry it back.

[2] It has been suggested that, even if Thropp's 1904 mold was not the actual invention, it was so near that its disclosure was in effect

a disclosure of the invention itself. Pickering v. McCullough, 104 U. S. 310, 319, 26 L. Ed. 749; National Cash Register Co. v. Lamson Consolidated Co. (C. C.) 60 Fed. 603. Those cases decide that matters of the detail of construction need not be perfected in order to constitute a disclosure of the invention; but that is far from saying that all the elements need not be present which the patentee has selected to constitute the invention. If, as I believe, Thropp chose for the elements composing his invention more than the bead molds; if he intended to be added enough more to make a curing equipment, that alone was his invention. It was his right to select, but his selection concludes him as to the scope of his combination. It does not lie with him later to say that his invention really lay in less than all the elements he selected, on the ground that one of the elements could easily have been supplied if the rest were disclosed. Having chosen to add the element in question as a necessary part of his patented invention, it included that element for purposes of earlier disclosure, as well as for everything else. That particular invention he could disclose only by an embodiment of all those elements, and it is quite immaterial whether a part of those elements also constituted a separate invention, which he might also have patented.

The bill is dismissed, with costs.