Charles S. **WHITE** and American Metal Products Company, Plaintiffs,

v.

The **FAFNIR BEARING COMPANY,**
Defendant.

No. 9584.

United States District Court
D. Connecticut.

Dec. 14, 1966.

Shepherd, Murtha & Merritt, Hartford, Conn., William K. Kerr, Albert E. Fey, New York City, for plaintiffs.

Hopgood & Calimafde, New York City, Robinson, Robinson & Cole, Hartford, Conn., for defendant.

## MEMORANDUM OF DECISION

CLARIE, District Judge.

This is an action for patent infringement brought pursuant to 35 U.S.C.A. § 100 et seq.; jurisdiction and venue are based on 28 U.S.C.A. § 1338(a) and § 1400(b). Charles S. White, the plaintiff inventor and owner of the patents in suit, is a resident of the State of California; the American Metal Products Company, the exclusive licensee with the right to sub-license, is a corporation having its office and principal place of business in Detroit, Michigan. The defendant, The Fafnir Bearing Company, is a Connecticut corporation, having its principal office and place of business in New Britain, Connecticut, where it manufactures the bearings, accused of the infringement.

The plaintiffs claim that the defendant has infringed United States Patent No. 2,885,248, entitled "Molded Bearing Having Low Friction Mating Surfaces" and Reissue Patent No. Re. 24,765, entitled "Low Friction Fabric Material". In this action, they seek an injunction against further infringement, an accounting of the profits and damages for past infringement.

The defendant denies the allegations of the complaint and affirmatively alleges that the patents in suit are unenforceable

against it, because the plaintiffs have been guilty of laches, while the defendant invested in and expanded its business, of making and selling the accused devices. In addition, the defendant has counterclaimed under 28 U.S.C.A. § 2201 and seeks a declaratory judgment that the defendant has not infringed the patents in suit; that they are invalid, and were anticipated by the prior art. The defendant requests that the Court declare both patents invalid, because they do not conform with the requirements of the patent laws; and that Reissue Patent No. Re. 24,765, is unenforceable against the defendant, because of the latter's having acquired intervening rights, 35 U.S.C.A. § 252.

The Court finds that both patents are valid and infringed. The Court will not at this time pass upon the dollar value of the damages, because the parties have stipulated that any accounting in damages for past infringement shall be reserved to be determined at a subsequent hearing.

### ISSUES

1. Were the inventions disclosed and claimed in plaintiffs' claims #3, #4, and #5 of Patent No. 2,885,248, and disclosed and claimed in plaintiffs' claims #1, #5, #6, #7, #8, #9, and #10 of the Reissue Patent No. Re. 24,765, previously invented by others and disclosed in prior patents or publications, or were they publicly known to prior public uses?

2. If not, are the differences between the prior art and the inventions claimed in each of the aforesaid patents such, that the subject matter of each would have been obvious to a person having ordinary skill in the related art?

3. Are Patents No. 2,885,248 and Re. 24,765, unenforceable against this defendant by reason of plaintiffs' alleged delay in bringing this action?

4. Is Reissue Patent No. Re. 24,765 unenforceable against this defendant by reason of its claim of having acquired intervening rights?

### FACTUAL SUMMARY OF THE DEVELOPMENT OF PLAINTIFFS' PATENTS IN LITIGATION

On June 16, 1955, United States Patent No. 2,885,248 was originally filed by the plaintiff, Charles S. White; it related to a "Molded Bearing Having Low Friction Mating Surfaces". A patent was granted to him on this invention May 5, 1959. He continues to be the present owner of said patent which expires May 5, 1976. The second patent in litigation, United States Patent No. 2,804,886, was originally filed on November 4, 1955. It pertains to "Low Friction Fabric Material" and a patent was originally issued to White on September 3, 1957, which expires September 3, 1974. Thereafter, White voluntarily surrendered this latter patent on January 19, 1959, pursuant to the provisions of 35 U.S.C.A. § 251, and a Reissue Patent, No. Re. 24,765, was issued in its stead on July 12, 1960. An exclusive license to manufacture under these patents, together with the exclusive right to grant sublicenses, was assigned by the plaintiff inventor, Charles S. White, to the American Metal Products Company.

Prior to White's employment by American Metal Products Company, in the summer of 1954, he had been an engineering consultant to the O & S Bearing Co., and had been directed by the latter company to do special consulting work for the Packard Motor Car Company, concerning the development of a ball joint front-end suspension system for automobiles. (P-1). His early development of this ball joint construction consisted of a metal housing with a ball stud. The bearing cup or liner inside the housing was constructed of sandwiched or laminated layers of cotton duck or canvas, impregnated [1] through the interstices of the fabric with a high impact phenolic resin. After the fabric cup element had been preformed and shaped, heat and pressure were then applied, causing the resin impregnated laminated elements to

---

1. *Impregnated:* after pre-drying the fabric to remove any traces of moisture on the yarn, it is immersed in a liquid solution of high strength thermosetting type phenolic resin. (Tr. 2750).

polymerize and cure out to a hardened state in conformation with the spherical ball. This created a functional structure (P–2, Patent No. 2,835,521) as a load bearing element against which the ball could move.

When White first came to American Metal Products Company, he had already acquired an enriched experience and broad background in the development and testing of phenolic cured ball-joint bearing structures. In fact, he had already filed a patent application on December 8, 1953, covering such an invention, which was issued to him on May 20, 1958, as United States Patent No. 2,835,-521. His new work assignment at American Metal Products was doing further experimental research, development, and improvement of these ball-joint structures, with special emphasis on improving the frictional characteristics of the bearing liner (Tr. 90). To accomplish this, he tried and tested various configurations of lubrication grooves and holes together with a variety of lubricants, in a scientific attempt to ascertain the best lubricity and friction characteristics of various bearing elements.

In March 1955, (Tr. 116) White tested several forms of Teflon, each embodying distinct physical and chemical properties, but all possessing in greater or less degree the basic characteristics of inherent lubricity. These various forms of Teflon included powdered, flaked, granulated, and sheets; the latter were both perforated and non-perforated (Tr. 116). White incorporated each of them in a variety of structures, from a macerated material to a coating of the ball-joint liner. All of these techniques failed.

In these experiments it was discovered that the orientation of the Teflon particles in the resin mix, which made up the bearing surface, created an overall weakened structure. The Teflon in such a bearing cup or liner, when placed under load, would whip out or cold flow so that the ball would be riding on the straight phenolic bearing material at the primary seat, thus eliminating the sought-after effectiveness of the Teflon as the desired low friction bearing element. (Tr. 121). A variety of experimental alternative procedures were tried; among them were the adherence of a piece of thin Teflon sheet stock. They attempted to trap the phenolic by perforating the Teflon sheet stock with holes and utilizing the phenolic resin substance to mechanically trap the solid Teflon sheet in place. There was not sufficient adhesion, either mechanically or chemically, between the resin surface and the Teflon to prevent it from separating and peeling, so as to cause the bearing structure to degrade and disintegrate under load.

It was sometime in April 1955, that White first observed by chance a piece of Teflon woven fiber fabric. He saw it on the desk of an official at the Wyandotte Chemical Co., in Detroit, where he was being shown through the plant by his neighbor, Mr. Bigley, who was also an official of the latter company. The Teflon fabric at the time was being used as a filter material for chemicals and when White showed interest in it, a small piece was given to him.

Experimental bearings were immediately constructed by his using the new filter fabric, trying it in bearings both with the macerated phenolic impregnated cotton duck or canvas and the techniques of the phenolic laminated sandwiched material. The Teflon fabric was placed between the ball and the phenolic impregnated canvas backing. The phenolic resin in its pre-set stage, under heat, permeated up through the interstices of the Teflon fabric and assisted in mechanically trapping the Teflon woven fabric and anchoring the Teflon threads, so as to hold the all Teflon cloth fabric in place. (Tr. 185).

By utilizing this process in curing the liner in direct contact with the ball, White was able to achieve good conformity between the ball and the hardened phenolic liner material. (Tr. 94, 98, 690–2, 130–1). Any excess resin which flowed through onto the bearing surfaces was then removed by vapor blasting. The

original friction and torque [2] tests on this new bearing indicated that its performance was superior to anything that had been previously tested.

White had discovered what he thought would be an ideal bearing material. (Tr. 149). Under load, it reduced not only the dynamic friction [3] of the bearing, but also its breakaway friction [4]; and tended to bring the measured magnitude of each much closer together. Generally speaking, it is considered a very desirable characteristic for ideal bearing engineering, to reduce the breakaway friction to approximate or equal the dynamic friction resistance. (Tr. 148; P–8).

One of the difficult problems White experienced was controlling the amount of resin flow-through or bleed through onto the working bearing surface. Unless this could be controlled, a fluctuating condition of variable quality would always exist in the manufactured bearing (Tr. 184) and essential uniformity of product would not be achieved. Resin flow-through in moderate degree was essential to support the individual yarn bundles, and thus create a structural support for the yarn and mechanically entrap the Teflon fabric in place. This reduced the cold flow characteristics of the Teflon fabric (Tr. 185) under the bearing load and thus prevented it from deforming and destroying its inherent functional lubricity characteristics for bearing purposes.

While the original bearings constructed and tested were made from the piece of original Dupont Teflon filter cloth picked up at the Wyandotte Chemical Co., in Detroit, subsequent test bearings were constructed with woven Teflon cloth fiber

material purchased from the Dupont Chemical Co. under its trade identification "TAST–6464" [5]. It was the latter company that first applied the commercial trademark "Teflon" to tetrafluoroethylene resins. (Tr. 240).

Having been advised at Wyandotte Chemical that Dupont was the source of this fabric, White called the Dupont Company, in Wilmington, Delaware, on May 12, 1955, and advised Mr. Franklin, the head of its Textile Fibers Division, (Tr. 596) of the nature of American Metal Products' experimental bearing research program and his interest in Teflon fabric as a bearing material, for the construction of a new oilless, greaseless bearing. He discussed with Franklin his idea of using a compound woven fabric with all Teflon fibers on one surface and a more bondable material such as cotton, on the other. (Tr. 704–5; P–30). At the time, Dupont had no compound woven fabric in stock of the type suggested by White (Tr. 705), but Franklin agreed to send samples of such all-Teflon cloths as were then on hand. He sent three specimens (P–4, P–31A, and P–31B; Tr. 706–10). The first, a fabric identified as TAST–6464, was a tight weave of pure Teflon using threads which had been bulked by the "Taslan" process; the other two were open weave or screenlike fabrics. Franklin expressed the opinion that the latter two were most likely to do the best job. (Tr. 719).

However, on May 16, 1955, White phoned Franklin at Dupont and reported to him on the results of his experiments with the three fabrics and the tests subsequently performed by him in the ball-joint structures. (P–5). The TAST–

---

2. *Torque:* the relationship of a force necessary to turn an element; usually given in inch pounds or foot pounds. It relates normally to the distance that the force is imposed to turn a particular bearing element. (Tr. 338).

3. *Dynamic friction:* that friction of a bearing element after motion has once started and it is continuous; that is in steady motion. (Tr. 146).

4. *Breakaway friction:* that force required to put into motion a bearing, if that is what you are checking, from its zero or no motion point, static condition, to where you have motion, or a dynamic condition. (Tr. 146).

5. *TAST–6464:* (a fabric of Teflon, tetrafluoroethylene fiber) is a three by one twill, loom count 64 by 64, warp and filling five hundred denier, sixty filament, 19 turns per inch, textured from 400 denier, 60 filament. (Tr. 3877).

6464 fabric had shown the most favorable results, the other two which Franklin had recommended were not satisfactory. (Tr. 714, 715). These bearings with the TAST–6464 fabric were further tested on May 16, 1955, in the American Metal Products laboratory and found to be superior to anything produced up to that time. (Tr. 137–142). On May 20, 1955, White again reported to Franklin, at Dupont, by telephone, and advised him of the favorable results of the bearings' endurance tests. (P–34; Tr. 721–4). Franklin told White that additional fabric of this type in quantity could be obtained from Stern & Stern, weavers, of Hornell, New York. (Tr. 722–4). Until then White was not aware of this company (Tr. 723), but proceeded to order some all-Teflon fabrics from them sometime in June 1955.

White continued his testing of the all-Teflon fabric lined bearings, not only in the laboratory, but by actual operational road tests of ball-joints installed on motor vehicles. (P–8, P–9, P–11; Tr. 158–77). As a result of these trials, American Metal Products became enthusiastic about the bearings.

While working with this new fabric, White recognized that there existed serious problems of bondability of this all-Teflon fabric to the backing member and also that it was difficult to uniformly control the resin flow-through or penetration at the bearing surface. This phenomena required an additional processing step of vapor blasting, to remove the excess resin from the bearing face, so that the functional lubricity characteristics of the Teflon fabric could fulfill its purpose. (Tr. 232–5).

White's experiments caused him to conclude that the use of a compound woven fabric could minimize bonding (Tr. 904) problems and make the overall handling of the material easier (Tr. 724–5) for mass production manufacturing. As a result of an earlier request by White for compound woven fabric, William Dean, a representative of Stern & Stern, visited White on June 21, 1955 (Tr. 725–9, 983). White, who was not an expert

in weaving, knew what he had to have and explained what he wanted, (Tr. 979, 980), namely, a fabric weave of all-Teflon threads on one side and all cotton threads on the other. (Tr. 725–6; P–35). During July 1955, he received from them some compound woven Teflon fabric, (Tr. 356, 488–9; P–3, p. 8) which had some cotton showing on the bearing working surface (Tr. 928). White called Mr. John Dupont, of Stern & Stern; previously, he had talked with the weaving superintendent, Mr. Benzoni, concerning the making of the fabric and had complained about the cotton showing through on the Teflon working surface. (Tr. 728, 730–3, 3744–5, 3749–50, 3763–4; P–3, P–149).

Stern & Stern then proceeded to weave and send to White a Dupont pattern fabric designated as T–26 (P–12) which contained characteristics which White had requested; namely, an all-Teflon working surface on one side and an all cotton surface on the other. Test bearings made from this fabric performed excellently. (Tr. 733, 187–8). Not only were the adhesion problems substantially reduced, but the new compound fabric improved the entrapment and anchoring of the Teflon fibers on the bearing surface. (Tr. 814–5, 374–5). The Stern & Stern sales representative, Mr. Dean, and Dupont's textile fabric representative, Mr. Franklin, each claimed at the trial that it was he, not White, who first suggested the idea of using the compound woven Teflon cotton fabric for ball-joint bearings. However, the sequence of events and the long delayed, unsubstantiated and inconsistent claims of both demonstrated to the Court conclusively, that the testimony of both was not only conflicting and unpersuasive, but without legal merit. (P–23).

The T–26 (P–12) pattern provided Teflon threads on the face and bondable cotton threads predominantly on the rear face. Functional fabrication of the ball-joint placed the Teflon fiber next to the ball and the cotton thread surface next to the phenolic resin surface (Tr. 189). White subsequently tested for aircraft

applications, T–27 (P–13), a glass-backed fabric made of glass filaments (Tr. 738–40) designed to withstand high temperatures. Where the temperature of a bearing was expected to be substantially elevated for a period of time due to operational conditions or if the environment in which the bearing was to function, included a contaminate or fluid detrimental to cotton (Tr. 742), a glass-back Teflon fabric was adopted, because other fibers would otherwise degrade out. (Tr. 836).

As soon as these bearings were proven functional, American Metal Products solicited the engineering departments of most of the nationally known automobile manufacturers, in the latter part of 1955 and the early part of 1956, including Ford, the General Motors Technical Center, Chevrolet's Inland Division, Cadillac, and others. Among these potential users, General Motors Technical Center on November 16, 1955, was furnished with full information regarding the detailed construction of these ball-joints (Tr. 526–27; P–14) developed by American Metal Products and on February 3, 1956, Inland Products Division of General Motors, at Dayton, Ohio, was given the same technical information. While it was mutually understood at the time that it was not a confidential disclosure, General Motors did agree to respect any valid patents issued (Tr. 525, 527; P–22). Except that valid patents were issued, they wanted to have free use of their own ideas to make them themselves. (Tr. 528).

Dupont was kept fully advised of the development of the Teflon fabric as a bearing material. They were most interested in promoting its new commercial use, because Teflon had been a very expensive product development for them (Tr. 530). At the urging of Dupont, a joint trade publicity conference to be participated in by American Metal Products and Dupont was arranged by Dupont for May, 10, 1956, at the Pierre Hotel, in New York City. At this meeting, Mr. Williams, then a director of American Metal Products and now its president, read a paper on the discovery and invention of the patented item (Tr. 534). Du-

pont's purpose at the time for this public relations meeting was to promote the use of Teflon fibers; it was given wide publicity in newspapers and business trade magazines (Tr. 536, 1338–9; P–24, P–26, P–27). Dupont's public releases from this news conference, represented that American Metal Products was the developer of this new and spectacular use for Teflon fiber; and Dupont, the originator of Teflon, had cooperated in developing the use for this versatile synthetic fiber. (Tr. 1538, 1539). Although Mr. Franklin, of Dupont, was present, he never even hinted at that time, that the development was ever suggested by him. (Tr. 538, 738). In fact, during the period White worked on this development, American Metal Products expended between a million and a million and a half dollars, in connection with White's research and experimental development activities on this item. (Tr. 510, 540). In 1956 or 1957, Mr. Williams, of American Metal Products, discussed with a representative of the defendant, The Fafnir Bearing Company, the possible issuance to them of a license to manufacture under the American Metal Products patents, but nothing materialized. (Tr. 548).

On January 8, 1947, American Metal Products purchased the Micro-Precision Bearing Division of Micromatic Hone Corporation and the remaining tool division of said company merged into the Excello Corporation. (Tr. 630). Subsequently, in November 1963, (Tr. 543), the Micromatic Hone Bearing Division became a subsidiary of American Metal Products under the name Transport Dynamics, Inc. They commercially marketed their bearings under the tradename "Fabroid" (Tr. 754), selling approximately two and one-half million dollars worth of this product annually in 1964 and 1965.

Micromatic Hone Corporation acquired, in March 1955, from American Metal Products an exclusive license to use its Teflon lined bearings in aircraft applications. (Tr. 542–5; P–28, P–28A). It hired White as a consultant to design rodends, and plain spherical bearings. (Tr.

738, 1554–7). During the summer and fall of 1955, White assisted by Kuhn designed such bearings, utilizing compound woven Teflon liners fabricated pursuant to the patents, except that in the construction of the liner for use in aircraft bearings, T–27 (P–13) a fiber glass backed compound Teflon cloth was used, rather than the cotton backed T–26 ordinarily used in fabricating the automotive ball joints. Fiber glass material was selected in order to withstand the high temperatures encountered in many aircraft applications. (Tr. 739–42). In the early part of 1956, rod-end bearings employing the compound woven Teflon fiber glass linings were submitted to the Wright Aeronautical Development Center, in Dayton, Ohio, for test (Tr. 1562–4, P–120), and these tests demonstrated that the liner construction was so stable that the metal housing parts broke before the liner failed. (Tr. 1571–2; P–21).

In the fall of 1956, Micromatic Hone began making and selling these bearings. Tests by the Boeing Aircraft Company confirmed that these Fabroid bearings were eight hundred per cent (800%) better than any other bearings previously tested. (P–74A). White's successful development of the rod-end and plain spherical, self-aligning [6] bearings for the aircraft industry came at a time when the military services were acutely in need of this new type bearing. The design of supersonic aircraft after World War II, demanded thinner and shorter airfoil surfaces. This reduction in size of the airfoils allowed less space for the bearings used in connection with the aircraft control linkages and also imposed higher loads on those bearings, both because of diminished leverage and because air-frame loading increases exponentially with air speed. A combination of these factors created a critical need for bearings of a smaller size and a substantial increase in capacity for satisfactory use in high-speed aircraft. A similar need became apparent in connection with rotor assemblies on helicopters and in a multi-

tude of other applications in connection with modern-day aircraft. (P–69, P–46, P–47, P–81, p. 12; Tr. 1084–8).

In an attempt to satisfy this need, the Bureau of Aeronautics and the Navy Department instituted a program with a number of bearing manufacturers to design a "superseries" of bearings, which would be capable of meeting the exacting requirements imposed by these new aircraft designs. This program was originally commenced in 1952 with the five principal manufacturers who made ninety-eight per cent (98%) of the plain spherical bearings participating. They had already worked for two years on the project without success. (Tr. 1168–70; P–69, P–47).

Because of this failure on the part of the plain spherical bearing industry, the Bureau of Aeronautics convened a special group meeting in Washington in July of 1954, to revive the two-year old project of a "superseries" of bearings. (Tr. 1166–9, 1089–91; P–81, P–69, P–47). At this conference, representatives of the original five manufacturers who had failed miserably (Tr. 1169) during the previous two years, were present. In addition to the seven companies who were attempting to get into the plain spherical bearing business, there were three ball bearing manufacturers, including the top engineering management of Fafnir and two roller-bearing manufacturers; there were also representatives from fourteen (14) airplane manufacturers. (Tr. 1167; P–69).

At a subsequent meeting in 1956, called by the Navy, Fafnir had already intensified a basic research program on plain spherical bearings which it had undertaken months earlier. Its aim was to be the leader on the proposed "superseries" of bearings. (Tr. 1092, P–47). All related information, including pertinent patents, competitive literature on bearings, and data on military requirements, was collected (Tr. 1247; P–48). In October of 1954, Leonard Litsky was hired

---

6. *Self-aligning:* if the shaft is put through the ball in such a way that it is mis-

aligned, the shaft will carry the load through the ball element. (Tr. 1583).

by Fafnir to devote his full time to this research program. (Tr. 1243; P–49). Litsky reviewed the information, including the collection of patents which had been gathered, and he tested all competitive bearings made available to him. (Tr. 1248–50, 1255–7). Between the fall of 1954 and the end of 1956, a period of more than two years, Litsky designed and tested many bearings including a wide variety of materials, lubricants, and manufacturing techniques. All his attempts were blind alleys (P–80) and met with little or no success. (Tr. 1245–7, 1257–74; P–76, P–81).

In March 1957, after about three years of effort, Fafnir decided to manufacture and sell a line of steel on steel plain spherical bearings (P–56). This decision was made, notwithstanding the fact that no one in engineering or sales was satisfied with the product and everyone recognized its major deficiencies; because Fafnir like the rest of the industry lacked a better answer to the problem, and the airplane industry had no alternative but to accept such bearings. (Tr. 1466–7; P–98). This decision was later changed because Fafnir's steel on steel bearings failed Air Force tests (Tr. 1107–8; P–55); and more importantly, because at about this time Fafnir received information about plaintiffs' Fabroid bearings. (Tr. 1275–7, 1467–8; P–98). In January of 1957, Fafnir learned that Fabroid bearings had been tested by Boeing and were considered by them to be the "breakthrough" on the aircraft Unibal[7] problem. (Tr. 1185–91; P–71).

Fafnir's engineers and salesmen immediately set out to learn all they could about plaintiffs' Fabroid bearings. They unsuccessfully requested samples from Micromatic Hone (Tr. 1191–9; P–72, P–73, P–57) and defendant's sales manager, although he "knew better" (because he recognized that Boeing would regard the information as proprietory), nevertheless made an effort to obtain samples and information about the plaintiffs' Fabroid

bearing from Boeing. (Tr. 1430–9; P–89). A Fafnir saleman on the West Coast copied drawings of the Fabroid bearing, which he found on the desk of a test engineer at Boeing. (Tr. 1439–42, 1323–5; P–87, P–88). These attempts by Fafnir to acquire samples of Fabroid bearings and information about them continued for more than a year until the spring of 1958, when Fafnir procured a procurer to purchase six Fabroid bearings (Tr. 1331–4; P–90, P–91). Litsky examined these bearings and reported that they were "much better than any other bearings inspected to date." He concluded, "these bearings are the ones Fafnir must be equal to or better than, if we expect to·obtain any amount of business that is available." (Tr. 1334–8; P–75, P–91).

While trying to learn about plaintiffs' Fabroid bearings Fafnir also attempted to duplicate the construction of the Fabroid bearing. It tried to make a plain spherical bearing using as a liner material, which they erroneously believed was used in the Fabroid bearing, woven fiber glass coated with Teflon. (Tr. 1277–9, 1188–9). This, in fact, was not the construction of the Fabroid bearing, and these efforts were another "blind alley". (Tr. 1281–4). However, in the late summer of 1957, the defendant with the assistance of the Dupont Company, which had been closely associated with the progress of White's development from its beginning, copied Micromatic Hone's Fabroid bearing. (Tr. 1292–6; P–82, P–84).

At about this time, Fafnir also learned from Dupont about White patent #2,-804,886, (D–3), the original of the reissue patent in suit (Tr. 1309–14; P–85). Fafnir then tried to design around the patent. (Tr. 1314–8; P–76). Litsky endeavored to make a bearing competitive in performance with the Fabroid bearings, omitting compound Teflon cloth and using instead an all-Teflon cloth. (Tr. 1318–22, P–59). Patent No. 2,885,248

---

7. *Unibal:* A trade name or trademark of the Heim Bearing Company which has been used internally at Fafnir to designate a plain spherical bearing having one ball inside of an outer ring, rather than a multi-ball ball bearing. (Tr. 3159).

(P–18) in suit had not yet been issued and insofar as Fafnir knew the use of all-Teflon cloth posed no patent problems. He spent over a year working on aircraft bearings using all-Teflon cloth, and by late 1958 or early 1959, Fafnir thought it had a saleable bearing. (Tr. 1261; P–76, P–80).

Early in 1959, Fafnir learned that North American Aviation, as a result of having successfully tested plaintiffs' Fabroid bearings, intended to use Teflon lined bearings in several of its new airplanes. (Tr. 1454–7; P–58, P–61). The Fafnir Sales Department was anxious to participate in this new business which the plaintiffs' Fabriod bearings had generated and urged Litsky to provide sample bearings to North American, so they could qualify for the new airplanes. (Tr. 1442–6, 1452–4; P–59, P–97). Fafnir submitted bearings lined with all-Teflon cloth to North American (P–76, p. 9, P–59), but they too failed on test. (Tr. 1129–33; P–61, P–62). These bearings of aircraft quality are subject to very rigorous testing, and requirements of such bearings are most easily and readily met by using compound woven Teflon liners. The Radial Bearing Company, however, had produced "aircraft quality" bearings using all-Teflon cloth as the bearing surface of the liner. (Tr. 1581–8; P–124, P–125).

Fafnir then purchased some compound woven Teflon cloth and set out once again, as it had in 1957, to copy White's Fabroid bearings. (P–83, P–84). Shortly thereafter, Fafnir was successful in making a test bearing of this type and by June of 1959, such a sample was submitted to Grumman Aircraft, where it was tested and showed promise of satisfactory test. (D–33). After further testing of combinations of material, adhesive, and impregnating resins, recommendations were made in the spring of 1960, concerning the materials which would be best for Fafnir to use in commercial production. A market survey was made in May 1960 (Tr. 1137–9; P–63, P–64, P–103), and by the end of June 1960, Fafnir's top management decided "there is no reason why we shouldn't solicit business in this new field." (Tr. 1388–41; P–92, P–97). Fafnir's first experimental sale of Teflon-lined plain spherical bearings was made to the Kaman Aircraft Company on October 20, 1960 (P–148).

After approximately six years of continuous effort and failure, Fafnir was finally successful in fabricating Teflon lined "superseries" type of bearing, but only after adopting the essential elements of the plaintiffs' Fabroid bearings made according to the patents in suit. Fafnir now boldly advertises the principle embodied in White's patented Teflon linings, under the tradename "Faflon", as the secret of its successful bearings. (P–95). It gives the "tribute of its praise to the prior art"; it gives the Fabroid bearing the tribute of its imitation as others have done. Diamond Rubber Co. of New York v. Consol. Rubber Tire Co., 220 U.S. 428, 441, 31 S.Ct. 444, 55 L.Ed. 527 (1911).

"The imitation of a thing patented by a defendant, who denies invention, has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think." Kurtz v. Belle Hat Lining Co., 280 F. 277, 281 (2d Cir. 1922).

It is significant to note that five of the major bearing companies (Heim, Halfco, Southwest, Spherical, and Kahr) that made ninety per cent (90%) of all plain spherical bearings in 1954, had been trying for two years prior to the 1954 Washington meeting to make a "superseries" of bearings, but without success. At the second Bureau of Aeronautics bearing conference in January of 1955, it was reported that "Kahr was so discouraged with the results of their testing, that they had discontinued further tests." (P–51). At still a third conference, it was reported that the products of Southwest "performed poorly" and Halfo bearings were a little better. It was also noted that the Heim bearings were far superior to anything presently on the market. (P–43). Later events proved, that however superior Heim bearings were then, they were

not by any means the "break-through" that the plaintiff's Fabroid bearings provided. In point of fact, Heim working through the Dupont Company as Fafnir had done, later began to make Teflonlined bearings of the patented design. (P–85, pp. 5–6, P–107, p. 2).

## TECHNICAL CHARACTERISTICS OF THE PATENT

White Patent No. 2,885,248 (P–18) containing the descriptive title "Molded Bearing Having Low Friction Mating Surface" was the first of the two patents filed, which are now in litigation. It discloses and claims the use of a cloth fabric woven from Teflon threads as the surface of a bearing lined with phenolic impregnated material. The patent application filed on June 16, 1955, was granted by the Patent Office on May 5, 1959. Aside from the title, its contents described a unique solution of employing Teflon as a low friction material for purposes of a bearing surface, because of its low friction characteristics. The concept of having Teflon thread imbedded in phenolic resin, so that the resin entraps and supports the threads, is the essence of the invention. (Tr. 773).

The patent discloses that the main objects of the invention are:

" * * * (T)o provide a bearing made of a material sufficient to resist deforming when loaded and having a low friction material embedded in the bearing face thereof; to provide a bearing made of a resin material having a low friction resinous material embedded in its bearing surface which reduces resistance to break-away and provides a cool operating bearing surface; to construct a bearing of sintered material having embedded in the interstices thereof a low friction material which provides low friction operating characteristics to the bearing; to form a bearing of a backing material in postsettable stage having embedded in the mating bearing surface a low friction resinous material, all of which is formed to a mating bearing surface under pressure and hard-ened by the application of heat, and, in general, to provide a bearing made of a formable material having embedded therein a low friction material, all of which is simple in construction and economical of manufacture." (Col. 2, ll. 11–29).

"With this arrangement, the Teflon, or like material provides the low friction characteristics for the bearing surface, which thereby eliminates the use of a liquid lubricant commonly employed." (Col. 5, ll. 43–47).

The patent specification and claims #3, #4, and #5 thereof point out (Tr. 227–8) that Teflon lined bearings, which are made in accordance with these teachings, can operate without grease or other conventional lubricants, a distinctive and essential feature not previously disclosed or claimed in the prior bearing art.

The second patent in issue, is Reissue Patent No. Re. 24,765 (P–19) entitled "Low Friction Fabric Material". The original of this patent, No. 2,804,886, was filed on November 4, 1955, and granted September 3, 1957. The essential nature of the disclosure in this patent recites:

"The compound fabric material having the low friction fibers is bonded to a body made from suitable materials to form bearings, seals, pistons and the like." (Col. 1, ll. 41–44).

"For application such as bearings or seals it will be apparent that the body material which is selected for any particular application must be one which has the ability to resist deformation and to retain its shape and properties under the temperature conditions resulting from use." (Col. 1, ll. 51–56).

"The low friction fiber material in most cases does not bond readily with other materials, and in order to assure a good bond, bondable fibers are woven on the reverse side of the woven low friction fibers so that on the working face of the resulting woven material a low friction surface will be provided and on the opposite face

a bondable surface will be present. Thus assurance is had that the low friction fibers will be retained in position at all times since the bondable fibers are positively retained in position on the supporting materials." (Col. 2, ll. 20–31).

The state of the prior art discloses a copending application of Charles S. White, Serial No. 396,893 now White Patent No. 2,835,521, filed September 8, 1953, and issued December 8, 1953, for a ball joint bearing structure. It illustrates a ball joint having one element made from a plastic insert, wherein the shape of the ball is set by the application of heat after the insert is shaped to the adjacent surface under pressure. When the compound fabric disclosed in the '886 patent was secured to the insert with a surface of Teflon and gaged with a mating polished surface, the joint was operated more than 600,000 times in the absence of a lubricant and under a load of 2200 pounds per square inch without any visible wear on the insert or surface.

The main object of the No. 2,806,886 patent invention was:

" * * * (T)o provide a compound fabric having a low friction surface on one side and a bondable surface on the opposite side." (Col. 3, ll. 39–40).

The disclosure further goes on to refer to certain specific figures or drawings, which are disclosed in the patent.

"Fig. 3 is a sectional view of a ball forming a joint, with a woven low friction fabric face of a strip of webbing, embodying features of the invention;

"Fig. 4 is a sectional view of a strip of webbing employed in the socket of Fig. 3 before pressure is applied thereto;

"Fig. 5 is an enlarged plan view of the low friction webbing material illustrated in Fig. 4;

* * * * * *

"Fig. 7 is a perspective view of a sleeve woven to have a low friction surface on the inner face thereof,

made in accordance with the present invention;" (Col. 3, ll. 60–72).

The claims of this Patent, No. 2,804,886, recited in paragraphs one through four thereof described in detail a compound woven fabric for low friction surfaces and provides support for the low friction threads, so that the backing threads physically anchor the low friction threads at space points throughout the material against any substantial movement, when the backing threads are secured against any substantial movement. The threads are so interwoven in the warp as to have those of low friction characteristics exposed substantially on one surface of the fabric and the threads having the bondable characteristics exposed on the opposite face thereof.

On January 19, 1959, White applied for a reissue patent on the original Patent No. 2,804,886, which was granted by the Patent Office on January 12, 1960, pursuant to 35 U.S.C.A. § 251. The relevant part of this statute provides:

"Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue."

White's affidavit accompanying the reissue application recited in part:

"deponent verily believes that the Letters Patent referred to in the foregoing petition and specification and herewith offered to be surrendered is partly inoperative and invalid for the reason that patentee may have claimed therein as his own invention or discovery more than he had a right to

claim as new in claims 1–4 of said specification,"

It is significant to note that the "disclosures" in the Reissue Patent were substantially identical to the invention disclosed in the original patent, except for the omission of the use of Dacron and Saran fibers. However, the claims made in the Reissue Patent were more narrow, limited, and restricted than those in the original '886 patent.

Claim #1 of the Reissue Patent typically describes:

"A compound woven fabric antifriction bearing element having threads of two different materials, the material of one thread having the properties of being bondable to a material of a bearing member for the purpose of retaining and positioning the other thread, the material of which other thread is tetrafluoroethylene (Teflon) resin which has low friction characteristics but which is not readily bondable to the material of the member, the threads being so interwoven as to have those of tetrafluoroethylene (Teflon) resin disposed substantially on one face of the fabric to form the low friction bearing engaging surface for the member and the threads having the bonding characteristics disposed on the opposite face thereof whereby the bonding threads may be secured in position in a manner which does not substantially affect the low friction properties of the tetrafluoroethylene (Teflon) resin threads which are securely anchored in place by the intertwining portions of the bondable threads after the latter are secured in position to have the tetrafluoroethylene (Teflon) resin threads form the bearing surface."

Claim #5 described:

"A bearing comprising a backing member having a fabric material secured thereto to provide the working face thereof, said fabric material comprising a compound woven fabric having threads of two different materials, the material of one thread having the properties of being bondable to the backing member, the material of the other thread being a polymeric fluorocarbon resin, the threads being so interwoven as to have those of the polymeric fluorocarbon resin disposed substantially on one face of the fabric and the threads having the bondable characteristics disposed on the opposite face thereof, said bondable threads being bonded to the backing member to securely anchor the threads of the polymeric fluorocarbon resin in place as the low friction working face of the bearing."

In fact, all of the claims of the Reissue Patent, directly or indirectly refer to a bearing or bearing element; whereas, those in the original patent, on which the reissue was based, directed its claim to a compound woven fabric having threads of different materials, one of which, Teflon, had low friction characteristics to be used as a bearing surface, while the other possessed bondable characteristics, so that it might be firmly affixed to a backing member. Thus, the Reissue Patent narrowed its claims from the broad frictional bearing surface uses of the compound woven fabric, to a specific use, namely, a bearing element. It is significant to note that both counsel agreed even to the present time, the only known practical commercial use for this fabric is its adaption to the fabrication of bearings. All of the essential specifications, disclosed in the Reissue Patent, in addition to the title and the bearing drawings, were included in the original '886 application filed November 4, 1955. This is also manifest in the repeated references to bearings throughout specification disclosures. (Tr. 242–3).

While White's original Patent No. 2,-804,886 disclosed a bearing with a compound Teflon cloth liner, the claims were so broad, that they could be interpreted as claiming a compound Teflon cloth per se. This issue arose when the plaintiffs' attorneys notified Russell Manufacturing Co. that the latter's compound woven Teflon cloth infringed the original White

Patent. (D–12). Russell's counsel called to the attention of plaintiffs' counsel certain prior art references which disclosed compound cloth having one bondable surface and a less bondable second surface. While adhering to their position that the claims of the original patent, when properly construed, were directed to bearings and not to cloth per se, (D–73, D–75) after considerable correspondence and negotiations, American Metal Products' counsel decided to rewrite the claims on a reissue application, so as to strengthen their patent position and remove any room for controversy.

## DISCUSSION OF THE APPLICABLE LAW

■■■ A valid patent must be new and useful. 35 U.S.C.A. § 102. In addition, it must be more than routinely novel and embody patentable invention. Whether or not the patents are valid over the prior art depends upon whether the defendant can establish that the invention disclosed and claimed by the patents, taken as a whole would have been obvious to a man of ordinary skill in the pertinent art (bearing art) at the time the inventions were made. 35 U.S.C.A. § 103; Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). It is the burden of the defendant to prove the invalidity of the patent and it is also its burden to demonstrate obviousness. The question is whether the patented devices are so different from the prior art, that such differences would have been obvious to a man of ordinary skill in the bearing art in 1955.

> "It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed, after repeated efforts, to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor." Expanded

Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct. 652, 656, 53 L.Ed. 1034 (1909).

■■■ In passing upon the validity of patents, relating to structures which differ from prior art, the criteria of long felt want, efforts by others, and commercial success are the essential elements. B. G. Corporation v. Walter Kidde & Co., 79 F.2d 20, 22 (2d Cir. 1935); Graham v. John Deere Co., supra; United States v. Adams, supra.

> "The presumption of validity relieves the patent holder of the burden of establishing that validity as a requisite for the successful maintenance of an infringement action, and places the burden of establishing invalidity on the alleged infringer who asserts it. * * * More than that, the most that can be said of the presumption is that it requires that reasonable doubt on the question of validity be resolved in favor of the patent holder. * * * The statute does not require that the presumption be accorded the weight of actual evidence or that the use of the presumption should affect a decision of invalidity that would otherwise be reached with confidence. * * *" Lorenz v. F. W. Woolworth Co., 305 F.2d 102, 105 (2d Cir. 1962). "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made." 35 U.S.C.A. § 103.

> "The terms of the statute draw a clear line between devices which are true discoveries and devices which would 'have been obvious at the time the invention was made to a person

having ordinary skill in the art to which said subject matter pertains.' 35 U.S.C.A. § 103. If an improvement is to obtain the privileged position of patent protection, more ingenuity must be exercised in its creation than merely that which is possessed by an ordinary mechanic acquainted with the business and skilled in the art." Gross v. JFD Manufacturing Co., 314 F.2d 196, 199 (2d Cir. 1963). See Eibel Process Co. v. Minnesota and Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923); Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937); Radio Corp. of America v. Radio Engineering Laboratories, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163 (1934).

It was the defendant's claim that the new patent, No. 2,885,248 would have been obvious to any person skilled in the art, because it constituted the simple application of Teflon fabric to the construction of a bearing, the essential elements of which had previously been disclosed. Among other claims, it is the defendant's contention that the '248 patent does not constitute invention in the light of the patent previously filed by White on December 8, 1953, designated as Patent No. 2,835,521 issued May 20, 1958; that the '521 patent which provided a phenolic bearing with a low friction fabric liner was not substantially different from the '248 patent, except that Teflon woven fabric was substituted for graphited cotton fabric. It is significant to note that the '521 patent was pending from December 8, 1953 until May 20, 1958. In the interim, the '248 patent was filed June 16, 1955, and thereafter issued May 5, 1959. The defendant would confuse the disclosures and claims in the '521 patent by referring to a communication in the category of remarks made to the Patent Office by White's attorney during the process of getting the '248 patent application approved. It indicated that Teflon could be incorporated in the bearing described in the '521 patent and thus eliminate the use of special grease or lubrication. This Teflon usage, however, was not included in the disclosure in '521 nor was it included among the patent claims issued by the Patent Office on said application.

The original ball joint bearings, prior to the use of Teflon, required periodic lubrication in the truncated spherical bearing. In bearing and sealing applications, failure most often occurred when the lower friction surface materials would cold flow, spall, or seize, during use (P–47). The Teflon fibers are most efficient for this purpose over solid sheet Teflon material, because the fibers are much stronger in tensile strength than sheet Teflon made from exactly the same chemical substance. (Tr. 239). For example, its usable tensile strength is approximately twenty-five (25) times greater than the tensile strength of the same material in sheet form. The exceedingly high tensile strength, of the tetrafluoroethylene resins in fiber of filament form, provides substantial resistance against cold flow, which occurs when the resin is in the sheet or block form.

In developing this application, White's prior experience led him to apply a bearing lubrication theory on the ratio of running surface to surface interrupted, which he had learned from Ralph Teetor, a top engineer at Perfect Circle Piston Ring. (Tr. 826). This taught that when metal is rough-honed with deep scratches in the metal and then overlaid with fine hone to get a plateau, it was found necessary to have a definite ratio of the fine running overlay to what turned out to be interstices, where lubricants could be retained and kept in continuous feed. White found that this theory worked when applied to these Teflon bearings, provided there was a 30—40% Teflon surface exposure as against a 70—60% phenolic surface; (Tr. 827) the Teflon fabric constituted the lubricant, as if contained in a void, whereas under the Teetor theory, the interrupted surface or void is filled with oil lubri-

cant and operates hydro-dynamically.[8] This was a knowledgeable background factor to be reckoned with, even though it was not disclosed or claimed by White as an essential element in the patents filed. It disclosed that the dry lubricant (Teflon fabric) is supported with an impregnation of phenol formaldehyde, exposing a ratio of each to the running surface. It produces a surface with a definite character to it, which plain phenol formaldehyde and cotton does not have. (Tr. 3440).

Both parties agree that the compound woven fabrics designed so as to present threads of one material on one surface and threads of another material on the other surface are old and well-known for a variety of purposes. (Tr. 2570-1). The defendant introduced a collection of seven patents (D-56); among these were the Hawley patent No. 2,107,295 which disclosed a brake-lining in which threads impregnated with graphite was used together with unimpregnated threads to obtain varying coefficiency of friction and a brake lining. Other patents included Miller patent No. 2,130,359 (lampshades); Gobeille patent No. 2,312,089 (women's shoes) which latter patent was cited by the Patent Office at the time of the reissuance of Patent No. Re. 24,765 (P-19); also Sunbury patent No. 2,542,297 (iron board covers) which was also cited in the prior patent; British patent No. 197,731 (garment linings); British patent No. 10,146 (D-16, woven belting materials); and German patent No. 869,625 (tennis ball covers). British patent No. 10,146 (D-16) relates to woven belting material, or British patent No. 698,611 (D-66, Tab 7), a cloth does not display bondable characteristics on one side and lubricity characteristics on the other. They show nothing more than a variety of uses to which compound fabrics have been put in the past. None of the patents cited show the use of a compound fabric in a load sustaining member such as a bearing; nor do they show any appreciation whatever of the kind of bonding problems encountered and overcome by White. None of the references, from all fields widely divergent from the manufacture of bearings, contain the slightest hint that the compound fabrics disclosed in them could be utilized in the manufacture of bearings. (Tr. 2571, 2575). The defendant offered in evidence the Baekelund patent No. 1,054,265 (D-132), the Hooper patent No. 1,964,202 (D-133), and the Gatke patent No. 2,728,700 (D-134). These show nothing more than the use of phenolic impregnated fabrics, together with a solid lubricant such as graphite in bearings. The techniques disclosed in these patents were admittedly old and well-known at the time White made the inventions in question. The Bateman patent No. 2,840,881 (D-135) was offered in evidence as a felted material containing Teflon fibers on one surface, needled into the main body of the felt. This use had nothing to do with bearings and had no load carrying ability. Neither did it recognize the bonding and cold flow problems present when Teflon was used in bearing applications. The evidence disclosed that Garlock, Inc., of Palmyra, New York, also used Teflon fiber in packings in 1953 and 1954; this is claimed as prior art against White's invention. Garlock used Teflon fiber in manufacturing braided packings. (D-46, D-47, D-48). These packings were not impregnated with phenolic resin and do not demonstrate the critical relationship between phenolic resin and Teflon threads in bearing applications. It was conceded that Garlock's material was incapable of performing adequately under the kind of loads encountered in ball-joints and plain spherical bearings. (Tr. 1288-9).

In November 1954, General Motors embarked on a massive research program in an attempt to make an acceptable phenolic lined bearing (Tr.

8. *Hydro-dynamically:* designed for load and clearance and oil supply, or grease supply in such a way as to maintain a wedge as they are running, so as to avoid direct metal or component contact. (Tr. 635).

3475–6, 3564–5, 3620–3), and they did produce several bearings with Teflon fabric at the bearing surface. There is no evidence of an awareness by any one at General Motors of the relationship between Teflon cloth and the phenolic resin in those bearings, nor is there any evidence of any understanding of the critical nature of this relationship. The evidence establishes that these few bearings were tested and summarily discarded and no one ever knew the results of the tests. (Tr. 3524–5, 3573–4). The evidence further demonstrated that General Motors abandoned its experiment with Teflon fabric as the liner material. (Tr. 3510, 3564, 3604–13, 3629–30). When General Motors did go back to Teflon in December 1955, it did so only in the light of its knowledge of the plaintiff, American Metal Products' successes with all-Teflon and compound woven fabrics.

In the fall of 1955, the plaintiff, American Metal products had already made complete disclosure of its Teflon lined ball-joints to various divisions of General Motors in the Detroit area. (Tr. 521–7, 194–6). In particular, the plaintiff corporation had already made full disclosure of its bearing construction to Mr. Von Pohlemus in charge of the research chasses section of General Motors' Technical Center, in Detroit, on November 16, 1955. (Tr. 201–6; P–3, p. 17, P–14, P–22). Max Baker who was closely associated with the General Motors bearing program at the Inland Division, in Dayton, made frequent trips to Detroit and disclosed that he saw Von Pohlemus often. (Tr. 3582–4). Between the time that American Metal Products made its full disclosure to Von Pohlemus on November 16, 1955, and December 15, 1955, when the engineers of Inland made liners using T–26, American Metal Products' compound woven Teflon cotton fabric from Stern & Stern, (Tr. 3610) Baker had three weeks within which to see Von Pohlemus and get information from him about American Metal Products' ball-joint; and he testified that he had gotten such in-formation (Tr. 3583–4). General Motors' Inland Division's effort to make successful phenolic lined ball-joints amounted to a greater number and variety of failures, including an unsuccessful attempt using Teflon cloth at the bearing surface, which came to fruition only after they had received the information from American Metal Products' use of compound woven Teflon fabric in ball-joints. Even then, Inland continued to experiment with graphite Teflon wafers, (Tr. 3510), Teflon films, (Tr. 3611–4) and bizarre fabrics purchased in experimental quantities from Russell Mfg. Co. (Tr. 2538, 2636–39, 2652–60; D–68, D–69, D–70, D–77, D–86, D–87, D–92).

█ It is apparent that in late 1955, General Motors had no understanding or awareness of the desirability of the use of Teflon fabric in ball-joints. Had they appreciated its practical use, Clingman patent No. 2,838,436 (D–54), a well-known and conventional use of laminations of phenolic impregnated cotton, originating at General Motors, would undoubtedly have not been filed on November 3, 1955, after Clingman and his colleagues at Inland had conducted their unsuccessful and abandoned experiment with Teflon. Abandoned experiments are not prior art. De Laski & Thropp C. W. Tire Co. v. United States Tire Co., 232 F. 884 (S.D.N.Y.1915), aff'd 235 F. 290 (2d Cir. 1916); Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530, 534 (2d Cir. 1955), cert. denied 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799 (1955).

█ The defendant also relies on the Smith patent No. 2,919,219 (D–39, Tab 4) which was filed on December 30, 1955, five to eight months after White had made inventions of both patents in suit and filed applications. Smith's patent is not prior art. While the latter stated that he had written about his ideas as early as 1953, he had done nothing more. These writings are not effective as prior art.

Like the Dupont writings, Smith's disclosure was ignored by the industry and

never put into any practical use. He revealed his ideas to a considerable number of manufacturers of phenolic bearings (Tr. 2193-4) and to the Gatke Company, in particular, (Tr. 2200) but there is no evidence that any of these manufacturers paid any heed to Smith's ideas or made any effort to bring them to commercial fruition. Smith's fabric could be no more than one-half Teflon, whereas, White's compound cloth included one surface which is entirely Teflon. Another distinction is that Smith's layers of phenolic impregnated cloth are perpendicular to the bearing surface in such a way, that most of his Teflon is buried in his phenolic and only the ends of the occasional threads of Teflon are exposed at the bearing surface. This construction, which exposes less than two per cent (2%) of Teflon at the working surface, could not adequately accomplish the purposes disclosed in White's patent. Smith's orientation of his fabric would not require a compound fabric to facilitate bonding and Teflon threads so situated that their effectiveness would be largely wasted. In fact, White's '886 patent (D-3) was cited against the Smith application, at the time it was processed in the Patent Office and allowed. This is a further indication of its recognition as being different from White's patent.

While Fafnir had not admitted infringement of patent No. 2,885,248 (P-18), the plaintiffs, relying on claims #3, #4, and #5 of said patent, and more specifically claim #3 as a typical claim, have demonstrated that the defendant's structure embodies each of said claims. In Fafnir's plain spherical bearing, the metal body, the outer ring or outer member, constitutes the bearing having a metal body. (Tr. 1346). Claim #3 refers to "a face of hardenable material thereon." This hardenable material is the phenolicepoxy adhesive applied by Fafnir both to the metal body and to its compound woven liner material; (Tr. 137; P-81, p. 13), together with the phenolic resin with which the compound woven Teflon cloth used by Fafnir is impregnated. (Tr. 1349, 1351). The liner material used by Fafnir is a cloth of Teflon, Dacron, and cotton threads woven in such a way as to have about 95% to 98% Teflon on the bearing surface and predominantly cotton on the other surface. (Tr. 1349-50; P-145). The protruding portions of the rear face of the Teflon threads being embedded in the hardenable material which extends into the interstices between the weave of the threads to mechanically anchor the cloth to the body. The "Dragon" (P-81, p. 13), the defendant's industrial news circular, describes Fafnir's fabric as filled with phenolic resin.

Kuhn testified that he had actually cut apart and examined a Fafnir bearing (P-126); and he observed the structure of its liner both with a naked eye and with a microscope and took color photographs (P-127, 128) of the surface of the liner material through a microscope. (Tr. 1595-1604). He was able to observe, and his photographs demonstrated reddish areas where phenolic resin had come through to the bearing surface. (Tr. 1605). He then picked into the surface and observed phenolic resin immediateiy below the surface. (Tr. 1606). On the basis of these observations, he testified that the interstices of the cloth were filled with resin and the Teflon threads were imbedded in the resin. (Tr. 1607). His testimony in this respect stands uncontradicted. Fafnir's accused bearings thus fall clearly within claim #3 of patent No. 2,885,248 (P-18).

"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it." Graver Mfg. Co. v. Linde Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).

In respect to the Reissue Patent No. Re 24,765 (P-19), counsel for the defendant conceded on the record that if the patent is found to be valid, then his client, the defendant Fafnir, admits that

it has infringed said patent. (Tr. 37–38, 439). The Court finds that the Reissue Patent is valid, thus it naturally follows that the Court must find that the defendant has infringed.

■ Reissue patents are entitled to the same presumption of validity as original patents. Devex Corporation v. General Motors Corporation, 321 F.2d 234, 238 (7th Cir. 1963), cert. denied 375 U.S. 971, 84 S.Ct. 490, 11 L.Ed.2d 418 (1964); Hartzell Industries, Inc. v. McCauley Industrial Corp., 304 F.2d 481, 483–484 (6th Cir. 1962).

In March 1959, after these original companies had been working on the "superseries" for seven years, Fafnir noted that the only successful company in this field was Micromatic Hone. (Tr. 1486–7; P–102, p. 3). By 1961, five years after the appearance of plaintiffs' patented Fabroid Kahr and Heim had copied the Teflon-lined bearings made according to the teachings of the patent in suit. (Tr. 1497–8; P–107, p. 3).

The Radial Bearing Co., whose representatives attended the 1954 conference, also failed in its attempts to make a "superseries" bearing, but eventually succeeded in making Teflon lined bearings, (Tr. 1581–8) only after receiving assistance from Dupont. (P–124). Shafer Bearing Division of Rex Chain Belt, Inc., has since taken a license from the plaintiffs under the patents in suit and is now manufacturing Teflon-lined bearings under that license. (Tr. 1040–3; P–29). Thus, virtually the entire American bearing industry, at the urging of the military, spent five to seven years trying unsuccessfully to make the "superseries" bearings which were so urgently needed for use in modern aircraft. Success was achieved only after White showed the way, and thereafter, a substantial segment of the bearing industry, including the defendant Fafnir, followed in his footsteps and copied his bearings. Landis Mach. Co. v. Parker-Kalon Corp., 190 F.2d 543, 546 (2d Cir. 1951); Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 247 F.2d 343 (2d Cir. 1957); Reiner v. I. Leon Co., 285 F.2d 501 (2d Cir. 1960); Expanded Metal Co. v. Bradford, supra.

The plaintiff, American Metal Products' investment of over $1,000,000 in research and development on Teflon-lined bearings (Tr. 540) has resulted in the production and sale of bearings embodying the inventions of the patents in suit for a wide variety of applications. American Metal Products licensed Micromatic Hone to use White's inventions in the aircraft industry in 1955; during the several years Micromatic Hone was so licensed, before it was acquired as a subsidiary of the plaintiff corporation, it paid approximately $150,000 in royalties. (Tr. 545). Since November 1963, American Metal Products has conducted the bearing business itself, through its wholly owned subsidiary corporation Transport Dynamics, Inc. (Tr. 545–6). In the two years that the plaintiff corporation has owned Transport Dynamics, Inc., it has done an annual business of approximately $2,500,000 in Teflon-lined bearings made pursuant to the patents in suit. (Tr. 546). In addition to Micromatic Hone, American Metal Products also licensed the Shafer Division of Rex Chain Belt and in only two years, Shafer paid to it approximately $75,000 in royalties. (Tr. 547; P–29). Robert Hunter, manager of Shafer, testified (Tr. 1030) that Shafer paid five per cent (5%) royalties on its approximately $1,000,000 worth of business in Teflon-lined bearings in the year 1965, and the demand for such bearings was so great that Shafer's backlog of orders was larger than ever before. (Tr. 1041–3). He also disclosed that his company had investigated the validity of the White patents before it acquired the license to manufacture. (Tr. 1041–3).

Rod-end, plain spherical and journal bearings made by Transport Dynamics, Inc., and employing White's Teflon linings are now used in many difficult applications in modern aircraft. (Tr. 1626–7, 1631–2). Because such bearings do not require lubrication, they are highly desirable in inaccessible locations where

lubrication is impossible; (Tr. 1629–31) also their immunity to galling and threading make them highly desirable in applications where ordinary bearings fail because of these problems. A typical use application is illustrated by the pins, which are used to hold the wings on airplanes. (Tr. 1632–9; P–133).

Fabroid bearings are also used in helicopters where in one use application, these bearings eliminated the need for lubrication at forty-four (44) different points in a single rotor-head, (Tr. 1640–1) thereby materially reducing the maintenance cost and down-time. Similar helicopter applications were equally impressive (Tr. 642–9). Another engineering factor to be considered is that aluminum as a metal has always been difficult or impossible to use as a bearing material, because of its incompatability with itself. The Teflon fabric liner now makes it possible to use aluminum in bearings, (Tr. 1649–52) and thus achieve weight reductions which are a critical factor in aircraft construction (P–63). An illustration of this is the aluminum bearings used in the main landing gear of the Boeing 727 Transport, which weighs only five and one-half (5½) pounds, but is capable of sustaining a load of 490,000 pcunds. (Tr. 1653–4; P–137). Also, the Fabroid liner, makes it possible to use other exotic alloys in bearings; (Tr. 1654–6; P–138), and these Teflon-lined bearings are capable of operating, while immersed in hot corrosive liquid such as hydraulic fluid and jet fuel. (Tr. 1657–8).

Spectacular uses of Fabroid Teflon-lined bearings include the engine gimbals employed in mounting engines in rockets used for space exploration, wherein a single bearing accepts the entire 1,500,000 pounds of thrust generated by the rocket engine and the built-in lubricity factors still permit the engine to be moved so as to steer the space vehicle being propelled. (Tr. 1659–62; P–139A–D). Select uses for the superior characteristics of Teflon-lined bearings are also demonstrated by their use for the last three years in the suspension system of racing cars at the Indianapolis 500-mile auto race. (Tr. 754–9; P–39, P–40). The Somers Brothers' "Goldenrod", which holds the world land speed record for piston-powered automobiles rides on Teflon-lined bearings, (Tr. 759–60; P–41) as does Craig Breedlove's "Spirit of America", which holds the world record of turbine-powered vehicles. (Tr. 760–1; P–42, P–43).

■ The commercial success of White's Teflon-lined bearings and their widespread use in many extremely demanding applications are persuasive evidence of the validity of the patents. Electric Pipe Line v. Fluid Systems, 132 F.Supp. 123, 128 (D.Conn.1955) aff'd 231 F.2d 370 (2d Cir. 1956); Technical Tape Corp. v. Minnesota Mining & Mfg. Co., supra, cert. denied 355 U.S. 952, 78 S.Ct. 537, 2 L.Ed.2d 529 (1958); Waring Products Corp. v. Landers, Frary & Clark, 263 F.2d 160, 164 (2d Cir. 1959); American Technical Machine Corp. v. Caparotta, 339 F.2d 557, 559 (2d Cir. 1964); Mott Corporation v. Sunflower Industries Inc., 314 F.2d 872 (10th Cir. 1963).

■ The Reissue Patent No. Re. 24,765 is essentially the same invention entitled, disclosed, and contained in the original patent No. 2,804,886. The title and the specifications are considered along with the claims in order to afford reasonable protection to a patentee. Graver Co. v. Linde Co., supra. The Reissue Patent may include in its claims, what was described in the prior patent, as well as what was implied or suggested in the original drawings, specifications, and models. Weller Manufacturing Company v. Wen Products, Inc., 231 F.2d 795 (7th Cir. 1956); Funchion v. Somerset Knitting Company, 158 F.Supp. 57 (M.D. N.C.1958).

■ After the '886 patent had been issued, September 3, 1957, the Russell Manufacturing Company was notified by counsel for American Metal Products on September 27, 1957, of the alleged infringement (Tr. 2613) and the latter subsequently denied infringement by letter of January 21, 1958. (D–129). Cor-

respondence, conferences, and negotiations followed. On January 19, 1959, well within the two-year statutory period [9], the reissue application executed by White on December 29, 1958 (D–138) was filed, and it narrowed the original claims. This lapse of time, as stated, did not constitute an unreasonable or unwarranted delay. Tulchin v. Perey Mfg. Co., 87 F.2d 302 (2d Cir. 1937); Mahn v. Harwood, 112 U.S. 354, 360, 6 S.Ct. 451, 28 L.Ed. 665 (1884). With only few exceptions, narrowed reissues have not been held invalid for delay. See Federico, Intervening Rights in Patent Reissues, 30 Geo.Wash.L.Rev. 603 (1962).

The defendant stresses Kuhn's negative reply to the question relating to Fafnir's copying of the plaintiffs' products. This inquiry was addressed to the very limited area, of whether Fafnir could have copied any product of Micromatic Hone "as to a swaged construction" plain spherical bearing or rod-end. Obviously, Kuhn was required to answer as he did, since Micromatic Hone did not use the "swaged construction technique" of moving metal in the shaping of its bearing so as to deform or crown over the outer ring to finish the bearing used by the defendant Fafnir. (D–21C). Thus, this bit of evidence is not materially significant.

█ Fafnir claims that the '248 patent should be held invalid for double patenting because it attempts to unlawfully extend the first expiring monopoly term established by Reissue Patent No. Re. 24,765. Each of these patents is for a separate and distinct invention duly filed in the sequence of an improved development. No material evidence was educed which would establish the applicant to have been responsible for the delay.

> "In view of the fact that the date of issue of an application is beyond the control of the applicant, the chance of so extending the monopoly is disregarded, and it makes no difference

which of the applications issues first." Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 22 F.2d 259, 262 (2d Cir. 1927), cert. denied 274 U.S. 753, 47 S.Ct. 765, 71 L.Ed. 1333 (1927).

The defendant's strongest argument is made on its claim of intervening rights as provided in 35 U.S.C.A. § 252, which states in part:

> "No reissued patent shall abridge or affect the right of any person * * * who made, purchased or used prior to the grant of a reissue anything patented by the reissued patent, to continue the use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use or sale of the thing made, purchased or used as specified, or for the manufacture, use or sale of which substantial preparation was made before the grant of the reissue, and it may also provide for the continued practice of any process patented by the reissue, practiced, or for the practice of which substantial preparation was made, prior to the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue."

█ The doctrine embodied in this statute, grants to the Court equitable discretion to allow an infringer of a reissue patent to continue in a business established prior to the date of reissue, provided it can satisfy the Court that it would be inequitable to impose the sanctions customarily applied against the infringer of a patent. The extent of use prior to reissue is relevant in adjusting the equities involved, since intervening rights is a matter of equity.

---

**9.** 35 U.S.C.A. § 251 provides in part:
"No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent."

Southern Saw Service, Inc. v. Pittsburgh-Erie Saw Corp., 239 F.2d 339 (5th Cir. 1956).

" * * * (T)wo different degrees of protection are provided, to wit: one is absolute and the other is within the discretion of a court. Absolute protection extends only to specific things actually made, purchased or used before the grant of the reissued patent. With respect to continued manufacture, use or sale, a court is given discretion to act." Walker on Patents, Deller's 2d Ed., Vol. 4, p. 315 (1965).

■■■ Intervening rights is best described as a private defense in the nature of a license. Ashland Fire Brick Co. v. General Refractories Co., 27 F.2d 744, 746 (6th Cir. 1928); Gerhardt v. Kinnaird, 162 F.Supp. 858 (E.D.Ky.1958).

The defendant contends that it is entitled to derive these intervening rights from the activities of the Russell Manufacturing Company's selling of bearing thrust washers [10] to the Ford Motor Company in 1957 and thereafter. The record discloses that these items sold to Ford were 3–4 ply webbing type of fabrics (Tr. 2386–92), which were different in construction from the satin or sateen weave [11] fabric purchased by the defendant Fafnir (Tr. 2471). The type of fabric which the defendant bought from Russell did not become a production item at Russell until September 27, 1960 (Tr. 2678; D–62), a substantial time after the date of the Reissue Patent, January 12, 1960. It should also be noted, counsel for both parties stipulated that American Metal Products suggested and supplied thrust washers to Ford for this application, before any thrust washer was ever manufactured by Russell and sent to Ford. (Tr. 3826–7).

■■■ An intervening equitable right is an individual or personal defense; it cannot be successfully asserted in favor of a defendant through the activities of others. The equities of each case must be considered on its individual merits.

" * * * (A)n intervening right is one of which no one can take advantage except the party who is directly affected, unless the patentee waits so long to apply for his reissue that he can be understood to have abandoned his patent to the public." City of Milwaukee v. Activated Sludge, 69 F. 2d 577, 592–593 (7 Cir. 1934), cert. denied 293 U.S. 576, 55 S.Ct. 87, 79 L.Ed. 673 (1934).

"Intervening rights can be acquired only in connection with a broadened reissue; the doctrine is not applicable to a narrowed reissue." Walker on Patents, Deller's Ed., Vol. 2, p. 1373 (1937).

However, see Federico, Commentary on the New Patent Act, 35 U.S.C.A. p. 46 (1954) which claims that the new 1952 statute makes narrowed reissues also subject to intervening rights. See, Ball & Roller Bearing Co. v. F. C. Sanford Mfg. Co., 297 F. 163, 165 (2d Cir. 1924); Babcock & Wilcox Co. v. Springfield Boiler Co., 16 F.2d 964, 970 (2d Cir. 1927).

This Court finds that the Reissue Patent No. Re. 24,765 (P–14) was a narrowed reissue. While the original '886 patent claimed a low friction fabric material, as described in the disclosure and drawings (figures 3, 4, and 7) and suitable for making bearings, seals, pistons and the like, the reissue simply modified and limited its claims specifically to a bearing or antifriction bearing element. All of the surrounding circumstances of the original patent issuance No. 2,804,886 together with the disclosure content, clearly indicate, not only the intention of the patentee, but also the main objects of the original invention per se were for making bearings. No one could

---

10. *Thrust washer:* is used between two parts that are brought together, so that one can be moved upon the other, because of the lubricity of the particular washer. The Teflon fabric side of the washer has the lubricity. (Tr. 949).

11. *Satin or Sateen Weave:* a type of weave that has 80–90% of one type of yarn to the face of the fabric; the bottom being another type of yarn for another purpose. (Tr. 2530–1; 3682).

have been innocently mislead, and least of all the defendant Fafnir.

Fafnir's alternative thrust is based upon its equitable claim under the reissue statute, (35 U.S.C.A. § 252) in that it claims to have made substantial preparations for the manufacture, sale and use of the patented product prior to the reissue date, January 12, 1960. It claims that its activities and investment authorize the Court to afford it protection under the statute. In considering this argument the Court is not unmindful that Fafnir was not innocently mislead into its present predicament. Its officials were fully cognizant at all times of the questionable legal status of its conduct.

The Dupont Company had warned Fafnir of the possible patent infringement, when it discussed with them American Metal Products' techniques of fabrication (Tr. 1526, 1864, 3180–2; P–113, P–114). Dupont's patent attorneys had reviewed the patents and expressed an opinion which recognized legal merits in White's patent position. (Tr. 2033, 2034). In fact, Litsky himself had recognized the problem and tried his best to avoid using it, but without it he attained unsatisfactory results. (Tr. 1314, 1535, 1536; P–115). In fact, he had purchased Russell's fabric, because he believed that a patent they claimed to have, might circumvent the legal hazards involved in the use of TAST–6464 material [12]; (Tr. 1889–98) this was the fabric which had been previously furnished Fafnir by Stern & Stern, from Dupont Company specifications; (D–35, Tab 21) and these specifications included the essential requisite elements described to it by White. (Tr. 979, 980). The record is obvious that the defendant did wilfully and with full knowledge, copy plaintiffs' patented structures. Their alternative choice was to lose the opportunity to compete in a lucrative market, (P–77) where the type of quality bearing in demand was then beyond their ability to develop and commercially produce. (Tr. 1462–4).

The intervening rights doctrine could only apply under the statute, if at all, to the Reissue Patent No. Re. 24,765 and not to the molded Teflon bearing patent No. 2,885,248. The defendant's total investment in compound woven fabric lined bearings approximated $70,000 during the years 1957 and 1959. Its research efforts and expenses relating to the use of the pure all-Teflon fabric weave is not relevant; nor is their investment and expenses relating to the perfection of the Unibal plain spherical steel bearing. By Litsky's own admission, he did not make his first Teflon-lined bearing until August 1957 (Tr. 2997), and then he spent from October 1957 (Tr. 1317–22; P–76, p. 6) until early 1959 (Tr. 1261; P–76, pp. 8–9) using all-Teflon cloth in an attempt to avoid White's Reissue Patent, the only one to which intervening rights could apply, if established.

Fafnir was not actually in the business of commercially making Teflon-lined bearings in 1959. They had authorized and were in the first experimental production run of approximately 2600 sample rod-end bearings in September 1959; and by January 12, 1960, the critical date, none had been actually completed for commercial distribution; only 56 had been completed on January 29, 1960. (Tr. 3340). It was not until late June 1960, that Fafnir first indicated it would go into commercial production of Teflon fabric lined bearings. (Tr. 3245–6, 1340; P–92). Not until after that date did it seek customers; and none were actually sold until October 1960. (Tr. 3229–31; P–148).

While $70,000 may, at first blush, appear to be a large expenditure, in considering the equities it must be kept in mind, that as late as 1962, Fafnir's annual sales of Teflon-lined bearings were $102,843. (Tr. 3256). This was less than 0.2% of its total overall sales for that year (Tr. 3253) and in that respect it was a comparatively infinitesimal factor. (Tr. 3254). Thereafter, Fafnir's sales volume on this item

12. *TAST–6464 material:* is a Taslan Textured Teflon Fiber. (Tr. 1956).

**812**

grew from little or nothing in 1960 (Tr. 3255–6) to over $750,000 in 1965. (Tr. 3256). It is apparent that Fafnir's investment prior to 1960 was insignificant compared with its total investment thereafter. This is not the kind of prior substantial investment required to establish an equitable defense of intervening rights. Tulchin v. Perey Mfg. Co., 87 F.2d 302, 304–305 (2d Cir. 1937), cert. denied 300 U.S. 674, 57 S.Ct. 613, 81 L.Ed. 880 (1937); A. D. Howe Mach. Co. v. Coffield Motor Washer Co., 197 F. 541, 547 (4th Cir. 1912); United States I. Chemicals v. Carbide & Carbon C. Corp., 121 F.2d 665, 672–673, 4th Cir. 1941, rev'd on other grounds, 315 U.S. 668, 62 S.Ct. 839, 86 L.Ed. 1105 (1942).

 In light of all the circumstances, the Court finds that Fafnir had not made substantial preparation for the manufacture and sale of the accused bearings prior to the date of the reissue, within the contemplation of 35 U.S.C.A. § 252. Actual notice to the defendant of the patent's issuance on January 12, 1960 is not required. The issuance of the patent makes it public and confers constructive notice on all the world as of that date. Sontag Chain Stores Co. v. National Nut Co., 310 U.S. 281, 60 S.Ct. 961, 84 L.Ed. 1204 (1939).

 Fafnir's final claim is that the plaintiffs are guilty of laches, because they did not commence their suit more promptly. The defendant's infringing activity did not commence until the latter part of 1960 (P–148) and was minimal until October, 1961, when the defendant began to advertise the accused product. (Tr. 1343–4; P–93). This brief period of time is insufficient to support a defense of laches or estoppel. By reason of its own direct appropriation and imitation of the plaintiffs' invention, the defendant Fafnir has no standing to invoke the equitable power of this Court to escape the consequences of its own wilful acts. See Funchion v. Somerset Knitting Company, 158 F.Supp. 57, 61–62 (M.D.N.C.1958). Also, Harries v. Air King Products Co., 87 F.Supp.

572 (E.D.N.Y.1949) aff'd 183 F.2d 158 (2 Cir. 1950).

 The patent claims in suit are valid, infringed and enforceable against the defendant. Judgment shall enter for the plaintiffs on their complaint; the defendant's counterclaim is dismissed.

The findings of fact as they appear in this Memorandum shall constitute the Court's findings of fact in this case, pursuant to Rule 52(a) Fed.R.Civ.P.; the conclusions of law annexed hereto are attached and incorporated herein by reference as Appendix "A".

A hearing in damages shall be specially assigned to determine the dollar value thereof, in accordance with these findings.

## APPENDIX "A"
### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter of this action.

2. Plaintiff, Charles S. White, is the owner of White United States patents Nos. 2,885,248 and Re. 24,765, and plaintiff, American Metal Products Company, is the exclusive licensee under those patents with the right to grant sublicenses.

3. Plaintiff, Charles S. White, is the original and first inventor of the subject matter disclosed and claimed in White United States patents Nos. 2,885,248 and Re. 24,765.

4. Neither Smith patent No. 2,919,219 nor Smith's earlier writings are effective as prior art against White United States patents Nos. 2,885,248 and Re. 24,765.

5. The 1954 and 1955 Dupont memoranda are not effective as prior art against White United States patents Nos. 2,885,248 and Re. 24,765.

6. The 1954 experiments with Teflon lined bearings performed by the Inland Manufacturing Division of the General Motors Corporation were unsuccessful and abandoned experiments, and are not effective as prior art against White United States patents Nos. 2,885,248 and Re. 24,765.

7. White United States patents Nos. 2,885,248 and Re. 24,765 are presumed valid, and defendant has not sustained its burden of proof in attempting to overcome this presumption of validity.

8. Neither White United States patent No. 2,885,248 nor White United States patent No. Re. 24,765 is invalid for "double patenting".

9. White United States patent No. Re. 24,765 is for the same invention disclosed in White United States patent No. 2,-804,886, and White United States patent No. Re. 24,765 was duly and legally issued.

10. The inventions disclosed and claimed in White United States patents Nos. 2,885,248 and Re. 24,765 are novel, and are not anticipated by the prior art.

11. The inventions disclosed and claimed in White United States patents Nos. 2,885,248 and Re. 24,765 would not have been obvious to a man of ordinary skill in the bearing art in 1955.

12. Claims #3, #4, and #5 of White United States patent No. 2,885,248, and claims #1, #5 and #9 of White United States Patent No. Re. 24,765 are valid.

13. Defendant has infringed claims #3, #4, and #5 of White United States patent No. 2,885,248, and claims #1, #5 and #9 of White United States patent No. Re. 24,765.

14. Plaintiffs have not been guilty of laches or unreasonable delay in commencing this action.

15. Defendant is not entitled to intervening rights with respect to White United States patent No. Re. 24,765 because: (a) defendant was not in the business of manufacturing Teflon-lined bearings prior to January 12, 1960, the issue date of White United States patent No. Re. 24,-765, and has not proved that it made substantial preparation for the manufacture and sale of Teflon-lined bearings prior to that date; and (b) defendant is not entitled to rely on the activities of the Russell Manufacturing Company to establish intervening rights in its favor.

16. Plaintiffs are entitled to judgment enjoining defendant, its officers, servants, agents, and those in privity with it, from further infringement of White United States patents Nos. 2,885,248 and Re. 24,765, and to an accounting for damages to which plaintiffs are entitled as a result of defendant's past infringement.

17. Plaintiffs are entitled to recover their actual Court costs in this action.