**J. W. L. FUNCHION, Plaintiff,**

v.

**SOMERSET KNITTING COMPANY, Inc., H. E. Crawford Mill Supply Co., Inc., Narcisse Aubre and T. A. Fulton, Defendants.**

**Civ. No. 1077–G.**

United States District Court
M. D. North Carolina,
Greensboro Division.
Jan. 10, 1958.

Ben L. Herman, High Point, N. C., Pearson & Pearson, Lowell, Mass., for plaintiff.

David Rabin, Arthur O. Cooke, Greensboro, N. C., for defendants.

HAYES, District Judge.

The plaintiff, a citizen of Canada, instituted this action against Somerset Knitting Co., Inc., a Canadian Corporation, Narcisse Aubre, a citizen of Canada, (the principal stockholder and manager thereof) H. E. Crawford Mill Supply Co., a North Carolina Corporation and T. A. Fulton, citizens of the Middle District of North Carolina, for a declaratory judgment and to restrain the defendants from interfering with plaintiff's sales of an automatic hosiery trimmer and to recover damages in the sum of $50,000 which the plaintiff alleges he has sustained due to sales prevented by defendants. It is alleged that defendants wrongfully threatened to sue plaintiff's purchasers if they bought or used plaintiff's machines which defendants wrongfully claimed infringed Patent No. 2,705,827 and Reissue No. 24,316.

The defendants denied any wrongful conduct and filed a cross action or counterclaims in which it is alleged that plaintiff was the agent of Somerset Knitting Co. and Narcisse Aubre, in charge of production and sales of the Automatic Hosiery trimmer under patents above described; as such agent he obtained confidential information on the development and improvement of the patented device and while so employed that he violated his trust by secretly divulging to the engineer of Southworth Machine Company (who was employed to manufacture the machines for Somerset) and thereafter applied for a patent on plaintiff's machine to be used in competition with the product of his principal. Damages are sought for this unfair trade practice.

It is further alleged that Somerset Knitting Co. is the owner of U. S. Patents No. 2,705,827 and Reissue No. 24,-316; that plaintiff's machine infringes the Claims of both patents and prays for injunctive relief and damages. The plaintiff replied to the counterclaims, denying unfair trade practices, denying the validity of the Claims of either patent and denied that plaintiff's device infringes any of the Claims of either patent, if any of said Claims are valid.

Since the validity of the patents in suit and infringement are inherently involved in the determination of every cause of action, whether by plaintiff or by defendant, we shall answer those questions first.

A serious problem confronted hosiery manufacturers which arose by loose threads dangling on the inside of knitted hosiery. Until the inventions in suit, it had been the practice for one operator to turn the hosiery inside out, another operator to take hand shears electrically operated like a barber's clippers and manually move the shears over the inside surface of the fabric, usually in a flat form, to clip the threads, then a third operator to turn the hosiery outside back inside. This operation was expensive in the man power required but the operation was also expensive by the slow production and faulty clipping which resulted in excessive seconds.

Jean-Paul Gamache was an employee of Somerset Knitting Co., Inc., as an engineer with approximately 24 years experience in the design of power transmission and material handling apparatus, and was assigned to the task of designing and developing a machine which would

automatically perform the operation. He devoted his full time from early in 1953 to Oct. 18, 1954, to the solution of the problem. He filed his application for the original patent October 18, 1954, which was assigned to Somerset Knitting Co., Inc., and on which Patent U. S. No. 2,705,827 was issued April 12, 1955. While all ten Claims were allowed, it was discovered that each Claim was defective and unduly limited the scope of the invention disclosed in the original application. On December 26, 1956 an application for reissue was filed and, after very careful and minute investigation in the Patent Office, Reissue No. 24,316 was granted May 14, 1957. It repeated the 10 Claims of the original and added 11 additional Claims, correcting the former 10 Claims. The new Claims or 11–21 inclusive were covered by the disclosures in the original patent and were not properly claimed. Abercrombie & Fitch Co. v. Baldwin, 245 U.S. 198, 38 S.Ct. 104, 62 L.Ed. 240.

The disclosures show a base on which is located a revolving circular table or platform, upon which are spaced equidistant from each other 12 tubular rotatable forms upon which hosiery is to be placed with the inside turned outwardly convenient for clipping the loose threads therefrom; the rotating table occilates at a pre-determined position at which point the hosiery form is spun around rapidly while the table is occilating; while the form is thus spinning around, a thread clipping means through a separate mechanism automatically approaches the stocking and clips the threads and through an attachment sucks the clipped threads into an exhaust pipe to convey them away from the machine. After this operation, the table revolves another step, bringing the succeeding form to the station for revolving and for clipping the loose threads; in the meantime the form holding the first stocking, as it moves from the clipping area, is rotated slowly in order to afford inspection of the clipped stocking and it is moved on by the rotating table to the position where that stocking is removed and another one mounted on the form. Underneath the table is located the mechanism for accomplishing these numerous steps, all of which is minutely illustrated in the drawings and specifications. One of the various methods and mechanism recommended for the clipping device consists of four sheepshears, or similar to barber-clippers, but power driven, on a shaft, one pair above the other, and each driven by a separate motor, the object being to clip all of the threads at the same time, to avoid the necessity of moving one pair up and down as the stocking spins around before the cutting means. In reducing to practice his invention, the patentee discovered that a single unit clipping bar, similar to the lawn mower arrangement, was preferable and eliminated the use of three motors.

For convenience Claims 2 and 8 of the original patent are quoted below,[1] and 12 and 18 of the reissue.[2] The meaning of

---

1. "Claim 2. A thread cutting and inspection machine comprising a base, a rotary table thereon, a plurality of forms rotably mounted thereon, means for rotating said forms individually during their revolution with said table, a rotably mounted platform, clippers mounted for vertical reciprocation on said platform and adapted to engage said forms, and means for reciprocating said clippers, and means for oscillating said platform about the axis of said table."

   "Claim 8. A thread cutting and inspection machine comprising a base, a rotary table thereon, a plurality of forms rotably mounted thereon, a disk on each form, a rotary friction wheel engageable by said disks to rotate the forms individually during their revolution with said table, a rotably mounted platform, clippers mounted for vertical reciprocation on said platform and adapted to engage said forms, means for reciprocating said clippers, a clutch between said table and platform for driving the latter, means for periodically disengaging said clutch, and means for returning said platform in the reverse direction."

2. "Claim 12. A thread cutting and inspection machine comprising a plurality of individual rotable forms, means for supporting and conveying said rotable

the words "engage" and "engagement" is set forth in the reissue "to mean that the cutting blade or means is in close proximity to, adjacent to, or in spaced relation to, the fabric, that is, the blade that performs the cutting operation is sufficiently close to the knitted fabric to cut projecting threads but sufficiently spaced from the fabric to avoid cutting the stocking during the cutting of the threads."

The hosiery industry had tried in vain to solve the problem but failed. When the test model of this invention was demonstrated to hosiery manufacturers at High Point, N. C. in Nov. 1954, there was a spontaneous approval of the machine and 35 of them were ordered for prompt delivery at a price in excess of $6,400 each, and the complete success of the machine was established until the conduct of the plaintiff interrupted the sales. Operating in actual production resulted in a saving of from 2¢ to 5¢ per dozen by speeding up production six to eight times and reducing losses from seconds which were unavoidable when the operation was by hand. One operator could do more than three the old way.

█ █ The state of the prior art is best determined by Katzenmoyer No. 1,859,094 and Huffman No. 2,233,451 et al. These references were cited in the patent office but it was found that neither one nor all in combination were anticipatory of the Gamache invention. The patent in suit is entitled to a liberal construction as a basic pioneer invention. Seymour v. Osborne, 11 Wall. 516, 547, 78 U.S. 516, 547, 20 L.Ed. 33. The Claims must be read in the light of the original disclosure and the prior art, both to measure accurately the scope of the invention, and the range of equivalent to which it is entitled. It is not necessary in such a situation to restrict the invention to the precise structure disclosed, and here the principle is buttressed by the statement of the patentee that: "Although a specific embodiment of the invention has been illustrated and described, it will be understood that various alterations in the details of construction may be made without departing from the scope of the invention."

█ It is well established that Claims for a machine which refer generally to the "means" for accomplishing a specified result are not limited to a description of particular means in the specification. Eastern Paper Bag Co. v. Continental Paper Bag Co., C.C., 142 F. 479, 493, affirmed 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122.

█ The reissue patent was granted in strict accordance with 35 U.S.C.A. § 251 and Rules of Practice of United States Patent Office, Rules 171 through 176, 35 U.S.C.A.Appendix. The determination of the Commissioner to grant the reissue on surrender of the original and his determination that the inoperativeness in the original specification arose from inadvertence, accident or mistake is conclusive. Mahn v. Harwood, 112 U.S. 354, 360, 5 S.Ct. 174, 6 S.Ct. 451, 28 L.Ed. 665; Topliff v. Topliff, 145 U.S. 156, 171, 12 S.Ct. 825, 36 L.Ed. 658.

There is no substantial evidence to sustain a finding that the reissue application was not filed timely; or that the patent was obtained deceptively, or that the disclosures of the original patent not adequately Claimed, fail to embody the Claims of the reissue or that the inven-

forms in a prescribed path of travel, a thread clipping means mounted in juxtaposition to the path of travel of said forms, and means for rotating said forms individually during presentation to the thread clipping means."

"Claim 18. A thread cutting and inspection machine comprising a base, a hosiery supporting form, means for supporting said form, from said base and conveying said form along a directed path of travel, said form being freely rotable about a vertical axis on said supporting means, means for driving said supporting means, thread clipping means in the path of form travel for engaging the form, and means for rotating said rotable form at a selected position for thread clipping by the thread clipping means."

tion is not entitled to the protection of the reissue, or of any equitable estoppel due to any limiting statements made during the prosecution of the patent.

■ There is no prior art found which overcomes the presumption of validity. The patent office cited three references more pertinent to the invention than any or all of the others cited by plaintiff. The Patent Office considered and rejected Katzenmoyer #1,859,094, and Huffman # 2,233,451. These inventions clearly fail to anticipate the invention in suit. While they provided for a rotating table and stocking holders for a flat exposure for manually operating thread clippers they fall far short of the Gamache invention which consists of a patentable combination wherein every subordinate element or mechanism is a means capable of discharging a function and cooperates with the others to perform a combined result. Although some old elements are utilized in conjunction with new elements, nevertheless a new and highly economical result is accomplished. During consideration of the application for reissue, the Examiner seriously considered the Whitaker Patent #2,613,425, Oct. 1952 relating to bobbin stripping but found that patent inapplicable to the Claims presented in the Gamache reissue patent application.

The plaintiff offers eleven patents, three of which are considered above, and one publication as anticipating the reissue patent. The Ginsberg "Trim Master" publication deals with the manual hosiery trimming. Stout patent 2,722,728, issued subsequent to the Gamache Patent, was a device for a single hosiery non-rotatable form affixed to a stationary base, the form tapered and circumferentially slotted for introduction of loose threads into the slots for severence. Stout was an employee of Slane Hosiery Mills and the evidence discloses that the Stout device failed and never became a commercially acceptable apparatus. The other citations are in no wise related to the hosiery and no more anticipate the Gamache invention than did the ox-drawn wagon anticipate a caterpillar tractor.

### Infringement.

The plaintiff's Functional Automatic Hosiery Trimmer admittedly reads on Claims 11, 12, 13, 14, 15, 16, 18, 19, 20 and 21. The conveying means of the accused device differs from the preferred means of the Gamache patent in an inconsequential way and is clearly a substitution of one means for another; the function is identical and the way of performing the function is substantially identical. A chain conveyor is the equivalent of the table taught in the Gamache patent. They are inter-changeable and equivalent. The Claims of the Gamache patent likewise teach thread cutting or clipping means operating in a certain function and at, and in, a pre-determined way, and while it prefers, as one of the clipping means, a series of shears, the Claims are not restricted to that particular means. A man skilled in the art and knowing that he needed to clip threads on a stocking eighteen inches long could choose between using 3 pairs of blades six inches in length, or one eighteen inches long. The use by plaintiff of the lawn mower type of blades is a mere substitute for the multiple shears taught in Gamache patent, operating in cutting the threads at the same time, the same way and functionally accomplishing the same result. The accused machine includes in its structure and operation the substance of the Gamache patent (invention) by an arrangement of mechanisms that performs the same service and produces the same effect in substantially the same way and constitutes infringement. Burr v. Duyee, 1 Wall. 531, 572 and 573, 68 U.S. 531, 572 and 573, 17 L.Ed. 650.

■ For the reasons appearing elsewhere in this opinion, it is not necessary to discuss in any detail any intervening rights of the plaintiff between the granting of Gamache original patent and the filing of application for reissue. The plaintiff is not in a position to invoke the aid of equity to protect him against his

own wrong. It would be a misuse of an equitable plea to permit a trusted employee to appropriate his employer's secrets and secure a patent thereon and then allow him the protection of equity to secure him in his ill-gotten gain. Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587, 597.

### Plaintiff's Cause of Action.

■ It is obvious that the plaintiff is not entitled to any relief by way of damages or by injunction. The plaintiff occupied a fiduciary relationship toward Somerset and Aubre far greater than that normally existing between agent and principal. Aubre, the principal stockholder and executive officer of Somerset, could neither speak nor clearly understand the English language, but the plaintiff could do both. The plaintiff was entrusted with every power as Sales Director to promote the production and marketing of the Gamache Hosiery Trimmer. He made the arrangements with Southworth Machine Co. of Portland, Maine, to manufacture the machine, title to remain in Southworth until paid for. Details of construction, alterations and improvements from time to time were submitted by plaintiff to Southworth. The tubular holding forms, from the outset, were hollow and arranged for the hosiery to be drawn into the form by suction. It was the broad duty of the plaintiff to do everything within his power to make the production, sale and use of the device a commercial success. He was, in essence, a partner, for, after enough machines had been marketed to repay Somerset's initial investment, the profits were to be split between plaintiff and Aubre.

Plaintiff was fully cognizant of his duties to be faithful and not to compete or to defeat the enterprise he was bound to promote. When he employed Brewer to act as an agent under him, he reduced the contract to writing and bound Brewer against the very conduct which he himself resorted to against Somerset and Aubre. As the trusted agent of Somerset and Aubre, he secured every secret, experiment and method for the development of the Gamache patent, including the substitution of a single clipping means (lawn mower type) for the multiple shears and the optional suction method of removing the hosiery after the trimming operation. This relationship continued throughout 1954, 1955 and a part of 1956.

During the latter part of 1955, the plaintiff secretly contacted, at night, Southworth's designing engineer, and the two worked together without the knowledge of Southworth or of Somerset or Aubre, to design and to apply for a patent on the plaintiff's Hosiery Trimmer. By August, 1956, a prototype of plaintiff's machine had been completed. Plaintiff ordered 10 machines to be produced by Southworth, five of which were delivered in December 1956 and five in February 1957. However, plaintiff shipped the prototype Hosiery Trimmer to McCuiston Hosiery Mills, Haw River, N. C., on September 1956; secured orders for five machines in October 1956.

On November 16, 1956, plaintiff and Ginn filed a patent application for their Hosiery Trimmer, serial No. 622,660. The only knowledge plaintiff had concerning hosiery trimming was acquired by him while acting as agent of Somerset and Aubre. The so-called inventions of the patent for which he and Ginn applied were discovered in a confidential manner from Somerset or Gamache, when he in good conscience was obligated by his agency to promote the interests of his principal. He can not obtain the trade secrets, the experiments and work of his principal and the information acquired in his efforts to promote his principal's interests, and thereafter use the information so acquired to undermine and to injure his principal. He and his confederates must be restrained from such conduct. Mechem on Agency, 4th Edition.

■ It is an accepted principle in equity that an agent who wrongfully acquires rights or property of his principal in violation of his trust to his principal,

will be declared a trustee for his principal and compelled to account for all gains from such conduct. Hunter v. Shell Oil Co., 5 Cir., 198 F.2d 485, 488. Indeed equity will prevent a third person from obtaining and using trade secrets which he wrongfully obtains from the agent in violation of his trust. Colgate-Palmolive Co. v. Carter Products, 4 Cir., 230 F.2d 855, 865. If a patent issues on plaintiff's application in equity and good conscience it belongs to Somerset and plaintiff will be compelled to assign his rights therein to Somerset in accordance with the law in this circuit. Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 923; Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587; Reynolds v. Whitin Machine Works, 4 Cir., 167 F.2d 78, 86 and Colgate-Palmolive Co. v. Carter Products, supra.

█ Somerset Knitting Co., Inc., has been damaged, in any event, by the loss of 20 machines sold by the plaintiff, in which Funchion has profited at least, $1,000 per machine and his gain or profit is the proper measure of damages. This would be the test established for breach of a confidential relationship or betrayal of trade secrets in E. I. Du Pont de Nemours Powder Co. v. Masland, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016. Restatement, Torts Sec. 757. Assuming the 20 machines infringed the patent Claims of Somerset, the damages are $20,000 or $1,000 per machine. But plaintiff is liable in damages only for $20,000 whether by way of infringement or betrayal of trade secrets or both. The defendants insist that counsel fees should be taxed against plaintiff but the court, in its discretion, declines to do more than to impose a nominal attorney's fee of $100. The facts here might justify the assessment of reasonable fees under the standards enumerated in the Colgate-Palmolive Co. case but the court does not think the record in its entirety here will justify it.

Let a decree be submitted in accordance with the above and taxing plaintiff and the Surety on his bond with the costs to be taxed by the Clerk of court.