**TEXAS URETHANE, INC., Plaintiff,**

v.

**SEACREST MARINE CORPORA-
TION, Defendant.**

**Civ. A. No. 72–G–154.**

United States District Court,
S. D. Texas,
Galveston Division.

Oct. 24, 1975.

Douglas M. Chilton, Shirley & Chilton, Texas City, Tex., for plaintiff.

Robert M. Doby, Jr., Simon & Simon, Fort Worth, Tex., for defendant.

## MEMORANDUM OPINION

NOEL, District Judge.

### I. PREFACE

On July 28, 1972, plaintiff Texas Urethane, Inc. (hereinafter called Urethane) filed its Original Petition in the 122nd Judicial District Court of Galveston County, Texas. The Original Petition named as defendants Seacrest Marine Corp. (hereinafter called Seacrest) and Union Carbide Corp. (hereinafter called Carbide). Plaintiff complained that it possessed a secret formulation for a rigid urethane foam system developed by an arduous process of trial and error; that this secret formulation had been developed for the use of defendant Seacrest in manufacturing boats; that the formulation was a trade secret carefully guarded by plaintiff; that defendant Seacrest had knowledge of the fact that the formulation was a trade secret; that defendant Seacrest discovered plaintiff's secret formulation by unfair means and converted it to the use of defendant Seacrest; that such discovery and conversion constituted a breach of confidence; that defendant Carbide received knowledge of the formulation under circumstances such that Carbide knew or should have known that the formulation was not in the rightful possession of defendant Seacrest but was in fact the trade secret of plaintiff; that defendant Carbide had been unjustly enriched by the defendants' acts; and that plaintiff had suffered foreseeable damage as a result of the defendants' acts.

On August 25, 1972, defendants filed their Petition for Removal herein. The Petition alleged that plaintiff Urethane was a citizen of Texas, its place of incorporation and its principal place of business; that defendant Seacrest was a citizen both of New York, its place of incorporation, and of North Carolina, its principal place of business; and that defendant Carbide was a citizen of New York, its place of incorporation and its principal place of business. Accordingly, this Court had jurisdiction of the removed action pursuant to 28 U.S.C. § 1441, the case being one to which the original jurisdiction of this Court extended by virtue of 28 U.S.C. § 1332(a) (1).

On September 15, 1972, defendant Seacrest moved under Fed.R.Civ.P. 12 (b)(2) to dismiss the action as against it on the ground that the Court lacked in personam jurisdiction over it. This Motion required discovery by the parties and the receipt of testimony by the Court in addition to the customary memoranda of legal authorities and affidavits. On June 28, 1973, defendant's Motion to Dismiss was denied by the Court.

On February 20, 1974, a Stipulation of Dismissal of plaintiff's claims against defendant Carbide, signed by all parties, was entered. On the same day, defendant Seacrest moved for summary judgment under Fed.R.Civ.P. 56(b) and (c) on the grounds that no confidential relationship existed between Urethane and Seacrest; that no improper means were employed by Seacrest to learn the secret formulation, if one existed; that no conspiracy between Seacrest and Carbide existed; and that trade secrets are no longer subject to protection under a state law of unfair competition. A hearing was held on this Motion and it was denied on July 2, 1974.

The case then proceeded to pretrial preparation. The question of whether North Carolina law or Texas law would govern the merits of this controversy was presented to the Court. Following the Texas rule of *lex loci delicti*, this Court chose, on January 20, 1975, to apply North Carolina law and thus opted for the place-of-conduct interpretation of *lex loci delicti*. See Baade, *Conflict of Laws*, 28 Sw.L.J. 166, 215 (1974). *But see* the subsequent decision in *Challoner v. Day & Zimmerman, Inc.*, 512 F.2d 77 (5th Cir. 1975).

On January 31, 1975, the Court granted the Motion of defendant Seacrest for separate trials under Fed.R.Civ.P. 42 (b). The Court ordered "that the issue of the validity of and the proprietary right, if any, of the plaintiff Texas Ure-

thane, Inc., in and to the formulation for polyurethane foam which it claims to be a trade secret shall be tried first and separate and apart from all other issues . . . ." The case was given a special setting for April 15, 1975. After a conference in chambers on April 14, 1975, the case was brought to trial before the Court on April 16, 1975. The direct and cross-examination of the first witness for the plaintiff, Dr. William Davis, the President of plaintiff, consumed the first two days of trial. The third day in trial was consumed by the examination of plaintiff's second witness, George Phillip Speranza of Jefferson Chemical Company, Austin, Texas. On the oral testimony of these witnesses, on the deposition testimony of Dr. Davis, Eldridge Randolph Garretson, formerly an employee of defendant, James M. Payne, of Borg-Warner Corporation and Lucas van Widenfelt, formerly of Borg-Warner, and on the exhibits admitted at trial, plaintiff rested.

Defendants thereupon moved for a judgment in their favor on grounds that plaintiff had failed to meet its burden of proof. The Court declined to grant this Motion when made. Defendant then rested its case, presenting no evidence other than that admitted during cross-examination of plaintiff's witnesses. Defendant's Motion for Judgment was set for oral argument on May 8, 1975. What follows constitutes the basis for this Court's ruling in plaintiff's favor on the issue tried April 16–18, 1975.

## II. THE APPLICABLE LAW

■ As noted above, this Court has already determined that, pursuant to the principles of choice of law currently holding sway in Texas, the substantive law of North Carolina must govern the merits of this controversy. Since 1715, the law of North Carolina has provided, in varying terms:

> All such parts of the common law as were heretofore in force and use within this state, or so much of the common law as is not destructive of, or repugnant to, or inconsistent with, the freedom and independence of this State and the form of government therein established, and which has not been otherwise provided for in whole or in part, not abrogated, repealed or become obsolete, are hereby declared to be in full force within this State.

N.Car.Gen.Stat. § 4–1 (1969).

In *Waring v. Dunlea*, 26 F.Supp. 338, 340 (E.D.N.C.1939), a diversity case presumably controlled by North Carolina substantive law, the misappropriation by use of intellectual property in the form of a recorded musical rendition was condemned as an unfair trade practice.

In *Funchion v. Somerset Knitting Co.*, 158 F.Supp. 57 (M.D.N.C.1958), the federal court lacked diversity jurisdiction, but it seemingly applied common law principles. In ruling for defendant on its counterclaim, the Court found that plaintiff had violated his trust as defendant's agent. The Court observed:

> It is an accepted principle in equity that an agent who wrongfully acquires rights or property of his principal in violation of his trust to his principal, will be declared a trustee for his principal and compelled to account for all gains from such conduct. Indeed equity will prevent a third person from obtaining and using trade secrets which he wrongfully obtains from the agent in violation of his trust.

*Funchion, supra*, 158 F.Supp. at 62–63 [citations omitted].

■ Apart from these authorities, the North Carolina tribunals have provided little assistance on the subject of misappropriation of commercial values. The recent passage of an unfair competition statute in North Carolina has apparently done little to clarify the law of trade secret misappropriation. The new law provides in part:

> (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or

commerce are hereby declared unlawful.

(b) The purpose of this section is to declare, and to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business, and between persons engaged in business and the consuming public within this State, to the end that good faith and fair dealings between buyers and sellers at all levels of commerce be had in this State.

. . .

N.Car.Gen.Stat. § 75–1.1 (1969). One writer has suggested that section 75–1.1 imported section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) into the North Carolina law. *See* Comment, *Consumer Protection & Unfair Competition in North Carolina—The 1969 Legislation,* 48 N.Car.L.Rev. 896 (1970). However, section 75–1.1's enactment has not prompted the North Carolina courts to withdraw their characterization of the essence of unfair competition:

The test of unlawful competition is simple, and lies in the answer to the question: has the plaintiff's legitimate business been damaged through acts of the defendants which a court of equity would consider unfair?

*Liberty U/A, Inc. v. Eastern Tape Corp.,* 11 N.C.App. 20, 180 S.E.2d 414 (Ct.App.1971). Accordingly, this Court must look to common law principles to ascertain the elements of the tort of unfair competition by misappropriation of a commercial value—in this case, a trade secret.

Unfortunately, no single formulation of the law of trade secrets has gained the upper hand. *See* Note, *Unfair Competition and the Doctrine of Functionality,* 64 Colum.L.Rev. 544 (1964). One author has summarized the law as requiring two essential elements, the existence of a trade secret and a relationship between the parties that warrants relief. *See* Forrester, *Maintaining Trade Secrecy,* 4 Ga.L.Rev. 541, 548 (1970). Another has concluded that the cause of action includes four elements: (1) discovery; (2) intended secrecy; (3) use or threatened use by the defendant; and (4) unlawful acquisition. *See* Note, *Aerial Photography of Plant Construction to Obtain a Trade Secret is an Unlawful Appropriation,* 8 Hou.L.Rev. 574, 577 (1971). Section 757 of the *Restatement of Torts* states:

One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if

(a) he discovered the secret by improper means, or

(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or

(c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or

(d) he learned the secret with notice of the facts that it was a secret and that its disclosure was made to him by mistake.

Professor Prosser carefully avoids offering any formula for the tort of "interference with prospective advantage," within which he includes misappropriation of a trade secret. *See* W. Prosser, *The Law of Torts* (4th Ed. 1971) § 130, at 956–57. In an extended discussion of trade secrets Callmann opines that, "[T]he rationale for protecting the trade secret often depends upon the facts of the particular case." 2 Callmann, Unfair Competition, *Trademarks and Monopolies* (3rd Ed. 1968) § 51 at 344.

Thus, the Court is confronted not only with a dearth of direct precedent but also with a body of law which may conservatively be described as fluid. Under these circumstances, it would be inappropriate for this Court to set out in blackletter the elements that comprise the common law tort of misappropriation of a trade secret in North Carolina.

Accordingly, this Court will not address the question of what plaintiff might have shown in order to establish the validity of its right to the alleged trade secret. Instead, the Court will state its findings of fact and set forth only those conclusions of law that are necessary to dispose of the issue tried. As will appear, the Court has found that plaintiff possessed a formulation, discovered with difficulty and not generally known nor readily discernible, which had potential commercial value, which was only partially revealed to defendant and then in the context of a confidential relationship, and which was otherwise protected in every reasonable manner. As will also appear, the Court has concluded that plaintiff possessed a trade secret which defendant was not privileged to use or disclose and that plaintiff has, theretofore, sustained its burden of proof on the issue tried to the Court.

## III. FINDINGS OF FACT

Defendant Seacrest at all times material to this case engaged in the manufacture of boats for sale to retail distributors. The boats Seacrest sold were constructed by injecting liquid polyurethane foam into a preformed mold. The mold consisted of an inner and outer skin of Acrylonitrile Butadiene Styrene (hereinafter called ABS) plastic with a small opening for the foam injection. When the foam cooled and solidified, the rigid urethane appeared as the "meat" in a "sandwich" with ABS plastic "bread". The ABS plastic is also referred to as the "skin".

Seacrest had built in Washington, North Carolina an advanced facility for the production of boats. The ABS plastic needed for boat production was obtained from Borg-Warner Corporation. At various times, Seacrest received the polyurethane foam from different suppliers. The choice of foam to be used was critical both for Seacrest and for Borg-Warner, which stood to gain by the success of Seacrest. The polyurethane foam component contained highly variable ingredients and was required to

be well suited to Seacrest's use since its buyers demanded that the boats pass certain field-use tests in order to minimize the number of boats generating warranty claims.

The various companies competing with one another to supply Seacrest with polyurethane foam faced the challenge of refining their product to achieve a satisfactory level of performance. Given equivalent cost and quality, Seacrest was largely indifferent to who provided the product. The suppliers undertook the expense of researching and developing the foam in the expectation that Seacrest would purchase all its foam from the successful supplier.

Plaintiff was one of the companies interested in supplying Seacrest's needs. Dr. Bill Davis of Urethane invested much time and effort in a trial-and-error process to develop a foam formula which would perform satisfactorily in an ABS "sandwich" boat. Like the other prospective suppliers, Urethane, through Dr. Davis, attempted to refine its formula for polyurethane foam to meet Seacrest's needs.

Polyurethane foam has two basic components. One, commonly known as the "A" component, is a liquid chemical called a polymeric isocyanate. The second, known as the "B" component, is a liquid chemical that consists of four types of ingredients: a polyol, a catalyst, a blowing agent, and a surfactant. The polyol reacts with the isocyanate, the "A" component. The catalyst controls the speed of the reaction. The surfactant regulates the size of the cells or bubbles which appear in the foam when it solidifies.

The development of a commercially viable polyurethane foam is largely a matter of determining the ingredients in the "B" component. Different formulae for foam can vary according to the kind of polyol, catalyst, blowing agent, and surfactant that is used, the number of each that is used, and their relative proportions. A slight alteration of even one of the ingredients can radically af-

fect the performance of a foam under at least some circumstances, while other performance characteristics can be preserved when modifications are made in some or all of the ingredients. Thus, a radical breakthrough can be achieved by adding or changing only one ingredient and yet many ingredients can be adjusted to cause only minor improvements in performance. The development of a polyurethane foam is plagued by the difficulty of predicting the actual effects of a slight change in a formula, even though an experimental foam can be tested in a laboratory. For the use that Seacrest intended, field tests were a necessary prerequisite to full-scale manufacture with any foam.

A foam developer, such as Urethane, would often develop a foam formula which succeeded in some ways and failed in others. The goal of research and development would then be to "fine tune" the formula by making minor adjustments that would remove an undesirable performance characteristic or add a desirable one. If the "fine tuning" could not be accomplished, the foam developer would then seek the discovery of a basically new formula through radical changes in known formulae. This process generated a peculiar state of affairs. Many different formulae could be derived by "fine tuning" that would all seem remarkably similar even to the trained eye, yet two formulae that appeared almost identical could result in significantly different performance characteristics. The secret of any formula was not to be found in any particular ingredient but in the whole.

Thus, a trial-and-error process was the only way to succeed in developing a highly refined polyurethane foam. This was the process Texas Urethane and the other suppliers competing for Seacrest's business employed. When a foam supplier achieved a degree of success in the laboratory, Seacrest would pursue the new possibility by actually manufacturing boats for testing outside the laboratory.

When Urethane submitted a formula to Seacrest for field testing, it did not identify the exact components, their number or their relative quantities. Instead, pre-mixed components were shipped to Seacrest in color-coded containers with instructions for their use. In this way, the secret of the formula was kept. The research and development effort undertaken by Dr. Davis with the assistance of other personnel at Urethane yielded its return in this way: the sale of mixed components to Seacrest generated a gain approximately equal to the difference between the cost to Urethane of purchasing the raw chemical components, principally from Jefferson Chemical Company, and the price charged to Seacrest for the mixed chemicals. The effort and expense of developing the various Urethane formulations were great and the chance that any formulation would succeed was small. But in the event of success, the return that could be realized was correspondingly large.

In July of 1971, the Seacrest boats were experiencing such a rate of failure under customer use that Borg-Warner became concerned with Seacrest's ability to maintain its operations. Sears, Roebuck & Company, Seacrest's largest customer, was experiencing a high rate of warranty claims. Representatives of Borg-Warner suggested a concerted effort to improve the technology and reduce the failure rate. Although several companies were still interested in supplying Seacrest with foam, Borg-Warner and Seacrest agreed that Urethane was one of only two candidates likely to achieve the needed refinement. Thus, Borg-Warner's representatives proposed that the week of August 23–27, 1971 be devoted to an effort by a Borg-Warner urethane expert, Dr. Luke Widenvelt, a Borg-Warner engineering expert, Dr. James Payne, and Urethane's expert, Dr. Bill Davis, to "fine tune" the Urethane formula that had performed the best up to that time.

Until mid-1971, it had not been necessary for Dr. Davis to reveal the ingredients of his formula to anyone within or outside the Urethane organization. He alone knew the formula in complete detail. Personnel at Seacrest had from time to time learned some of the ingredients of Dr. Davis' formulae as they were being developed, but neither the exact proportions of each ingredient nor the total number of any of the four types of ingredients in the "B" component were ever revealed. Although a small portion of Dr. Davis' knowledge came to Seacrest's attention, Seacrest knew Dr. Davis regarded all the products of his work as his secrets. If Dr. Davis had thought that his secret would not be kept by Seacrest, he would have been as thoroughly protective of his knowledge with Seacrest as he was with all others, including Urethane's employees.

When Borg-Warner's proposal was accepted by Dr. Davis, Borg-Warner representatives and Dr. Davis executed a secrecy agreement that did not include Seacrest. The Seacrest personnel were insufficiently trained in the development of polyurethane foam formulae to make any contribution to the highly technical task of modifying the Texas Urethane foam formula. Further, no Seacrest personnel were allowed to participate in the laboratory phase of the joint effort; Seacrest's role was limited to the actual use of newly developed or modified formulae in making test boats. Seacrest did, however, have knowledge of the secrecy agreement through its employees and representatives.

In sharp contrast to Seacrest, Borg-Warner represented an obvious threat to Texas Urethane. Borg-Warner was a chemical, not a manufacturing, company. Borg-Warner and Texas Urethane had no special relationship beyond that created by the secrecy agreement. And, most critically, the cooperation required between Drs. Davis, Widenvelt, and Payne necessitated a sharing of specific information about the Urethane formula which went far beyond that which had occurred in Texas Urethane's dealings with Seacrest.

Under these circumstances, the joint effort between all the parties proceeded in August, 1971 and partial success was achieved. While Dr. Davis' formula was improved through the contributions of Dr. Payne and, particularly, Dr. Widenvelt, the Borg-Warner technical personnel were able to contribute only because Dr. Davis shared his knowledge of the formula's components with them under the secrecy agreement.

Thereafter, Seacrest continued to purchase polyurethane components from Urethane. In early 1972, however, Seacrest abruptly ceased ordering from Urethane and procured mixed components from Carbide markedly similar to the formula that was principally the creation of Dr. Davis.

To summarize, Dr. Davis, on behalf of plaintiff Urethane, discovered a formula for polyurethane foam through substantial labor and expense. This formula was kept secret and revealed, to the extent that it was, to defendant Seacrest only in the context of a confidential relationship. The formula had potential and actual commercial value. Every reasonable effort was made by Urethane to maintain the secrecy of the formula and defendant Seacrest had no privilege to use or disclose it.

This concludes the Court's Findings of Fact. As noted above, Defendant Seacrest sought and was granted a separate trial on "the issue of the validity of and the proprietary right, if any, of the plaintiff . . . in and to the formulation for polyurethane foam which it claims to be a secret . . . ." While the Findings of Fact do not tell the complete story, they are sufficient to permit the Conclusion of Law below.

## IV. CONCLUSION OF LAW

This Court's Conclusion of Law on the basis of the found facts is simple to the point of being singular: Plaintiff is possessed of a trade secret which is

protected under the common law of unfair competition against misappropriation by Defendant Seacrest. This conclusion states, in more precise terms, a determination favorable to Plaintiff on the sole issue tried to the Court thus far.

Under some of the approaches to the law of unfair competition discussed in Part II, *supra*, this Conclusion of Law is a dual one in that it constitutes a holding for Plaintiff on more than one element of its claim for relief. However, this Court is of the view that the nature of Plaintiff's right in and to the secret formulation is completely expressed only when account is taken of Plaintiff's relationship with Defendant Seacrest. Thus, this Court has deemed it insufficient to conclude merely that Plaintiff has a trade secret protected against misappropriation in the abstract. Further, the Conclusion of Law here reached is that Plaintiff's trade secret is protected against misappropriation by this particular Defendant.